1  Michael J. Reiser (SBN 133621)
      *michael@reiserlaw.com*
2  Matthew Reiser (SBN 315301)
      *matthew@reiserlaw.com*
3  Isabella Martinez (SBN 315299)
      *isabella@reiserlaw.com*
4  **REISER LAW, p.c.**
   1475 N. Broadway, Suite 300
5  Walnut Creek, California 94596
   Telephone: (925) 256-0400

6  Jason Kellogg (Fla. Bar No. 0578401)
      *jk@lklsg.com*
7  Victoria J. Wilson (Fla. Bar No. 92157)
      *vjw@lklsg.com*
8  Marcelo Diaz-Cortes (Fla. Bar No. 118166)
      *md@lklsg.com*
9  **LEVINE KELLOGG LEHMAN
   SCHNEIDER + GROSSMAN LLP**
10 100 Southeast Second Avenue, 36th Floor
   Telephone: (305) 403-8788
11 *Pro hac motions forthcoming*

12 *Attorneys for Plaintiff*

13

14

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 15 SOHAM BHATIA on behalf of himself and all others similarly situated, | Case No. |
| 16 | |
| 17     *Plaintiff*, | **CLASS ACTION COMPLAINT** |
| 18 v. | DEMAND FOR JURY TRIAL |
| 19 SILVERGATE BANK, SILVERGATE CAPITAL CORPORATION and ALAN J. LANE, | |
| 20 | |
| 21 | |
| 22     *Defendants*. | |

23       Plaintiff Soham Bhatia on behalf of himself and all other similarly situated,

24 brings this action against Defendants, Silvergate Bank, Silvergate Capital

25 Corporation and Alan J. Lane, and allege:

26

27

28

-1-

**INTRODUCTION**

1.    This is an action against Silvergate Bank and its parent company, Silvergate Capital Corporation (collectively, "Silvergate"), for aiding and abetting a multibillion-dollar fraudulent scheme orchestrated by Sam Bankman-Fried ("Bankman-Fried") through two of his entities, the cryptocurrency exchange FTX and the cryptocurrency hedge fund Alameda Research LLC ("Alameda").

2.    By becoming one of only a handful of U.S. banks that catered to cryptocurrency-related exchanges, funds and customers, Silvergate emerged from a small regional bank into a national bank with more than $12 billion in deposits. Because Silvergate did not have to pay interest on deposits to crypto companies like FTX — companies shunned by traditional banks and happy just to have a legitimate place to deposit their money — Silvergate was able to invest those deposits in low-risk securities that generated *hundreds of millions of dollars* in revenue for the bank.  Soon Silvergate became completely dependent on the crypto industry, which comprised 90% of its deposits and nearly all of its profits.

3.    Silvergate also separately developed a proprietary network called the "Silvergate Exchange Network" (or "SEN").  SEN allowed exchanges like FTX to offer its customers, for the first time, a 24-hour-a-day, seven-days-a-week trading platform for trading in cryptocurrency.

4.    In early November 2022, FTX, which was one of the largest (if not the largest) of Silvergate's depositors, as well as the largest user of the SEN network, filed for Chapter 11 bankruptcy protection.  FTX's majority owner, Bankman-Fried, acknowledged publicly that he used about $10 billion in FTX customer funds for Alameda, a separate, Bankman-Fried-owned company that engaged in complicated and risky crypto trading.

5.    Crucially, Silvergate held the accounts of *both* FTX and Alameda. Silvergate, which publicly touted its enhanced, proprietary anti-money laundering ("AML") and "Know Your Customer" ("KYC") systems, knew FTX and Alameda

were different companies.  It knew FTX held investor funds.  It knew Alameda engaged in risky trading.  It saw *billions of dollars* of investor money transferred out of FTX and into Alameda, then out of Alameda to pay Alameda's debts and to enrich Bankman-Fried and his inner circle.  It saw billions of dollars in FTX customer funds wired directly to Alameda and related entities.  But despite this knowledge, Silvergate — which proudly displayed on the home page of its website a quote by Bankman-Fried heralding Silvergate as the bank that "revolutionized crypto banking" — did nothing.  To the contrary, Silvergate substantially assisted FTX by continuing to allow FTX to use its Silvergate accounts and the SEN network.

6.     In the end, approximately $8 billion in FTX customer funds, including the funds of Plaintiff and about one million others, have been lost.  This lawsuit seeks to recover some of those losses, which would not have occurred had Silvergate stopped giving FTX access to its accounts and the SEN network when it saw what FTX and Bankman-Fried were doing.

## PARTIES

7.     Plaintiff Soham Bhatia is a citizen and resident of San Francisco, California.  Beginning around September 2021, Bhatia made eight separate deposits of cryptocurrency valued at about $20,000 in an FTX account for executing cryptocurrency trades and/or engaging in investment activity.  When FTX announced its bankruptcy in early November 2022, Bhatia tried to withdraw the assets from his FTX account but was unable to do so.

8.     Defendant Silvergate Bank is a California corporation with its principal place of business in La Jolla, California.  Silvergate Bank is California-chartered and overseen by the Federal Reserve Bank of California.  The FDIC guarantees its deposits.

CLASS ACTION COMPLAINT FOR DAMAGES

9.     Defendant Silvergate Capital Corporation is a Maryland company with its principal place of business in La Jolla, California.  It is the parent of Silvergate Bank.

10.     Defendant Alan J. Lane is the CEO of Silvergate Bank and the president and a director of Silvergate Capital.  He resides in Temecula, California.

## JURISDICTION AND VENUE

11.     <u>Subject Matter Jurisdiction</u>. The Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, Title 28, United States Code, Section 1332(d), because (i) the matter in controversy exceeds $5 million, exclusive of interest and costs; (ii) there are members of the proposed Class who are citizens of different states than Defendants; and (iii) there are in the aggregate more than 100 members of the proposed class.

12.     <u>Personal Jurisdiction</u>. This Court has specific personal jurisdiction over Defendants pursuant to Section 410.10, Cal. Code Civ. P., and pursuant to Defendants' substantial, continuous and systematic contacts with the State of California, and because Defendants have purposely availed to the benefits and privileges of conducting business in the State of California. The Court has personal jurisdiction over Defendants based on their substantial, continuous, and systematic contacts with the State and because Defendants have purposely availed themselves of the benefits and privileges of conducting business activities within the State. In particular, Defendants are headquartered in California, and Defendant Silvergate Bank is a California-chartered bank.

13.     <u>Venue</u>. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the District. For example, as discussed below, FTX and Alameda were headquartered in this District until 2019, when they moved internationally. Based on the timing described in Bankman-Fried's public statements, the decision to misappropriate FTX customer funds into Alameda accounts was made in this

1  District. Bankman-Fried and other witnesses are located in this District.

2  Defendants also have substantial, continuous and systematic contact with this

3  District through the marketing and provision of its banking and SEN services to

4  many businesses and individuals that reside in this district.

5  **GENERAL ALLEGATIONS**

6  **A.  FTX**

7  14.  The FTX group of companies (collectively, "FTX") were founded by

8  Bankman-Fried along with Zixiao "Gary" Wang ("Wang") and Nishad Singh

9  ("Singh"). Bankman-Fried controlled and held a 90% interest in FTX.

10  15.  Among other services, FTX provided a "spot market" trading platform

11  allowing users to trade cryptocurrency such as Bitcoin and Ethereum with other FTX

12  customers in exchange for either other cryptocurrency or "fiat" currency like U.S.

13  dollars. Cryptocurrency is digital currency designed as a medium of exchange

14  through a computer network, and does not rely on any central authority, like a bank

15  or a government, to maintain it.

16  16.  FTX had more than 100 million users as of August 2022. It grew to

17  become the world's second-largest cryptocurrency exchange, and at one time was

18  valued at $32 billion.

19  **B.  Alameda Research**

20  17.  In 2017 (prior to founding FTX), Bankman-Fried, Wang and Singh

21  founded Alameda Research LLC ("Alameda"). Bankman-Fried held a 90% interest

22  in and controlled Alameda.

23  18.  Alameda was essentially a hedge fund specializing in cryptocurrency

24  assets. Like other hedge funds, it executed sophisticated and aggressive trading

25  strategies like arbitrage, market making, yield farming and capitalizing on market

26  volatility. Unlike traditional hedge funds, Alameda's focus was crypto.

27  19.  Importantly, Alameda, its affiliates and subsidiaries were completely

28  separate from FTX. Indeed, Bankman-Fried stated publicly that Alameda, a crypto

hedge fund serving private investors, was a "wholly separate entity" from FTX, a crypto exchange serving retail customers.

**C.     Silvergate Bank and Alan Lane**

20.     Silvergate caters to the cryptocurrency industry.  It describes itself publicly as "the leading provider of innovative financial infrastructure solutions and services to participants in the nascent and expanding digital currency industry."

21.     Indeed, Silvergate's importance to the crypto industry was summed up by Bankman-Fried, whose quote was featured prominently on Silvergate's website:

> "Life as a crypto firm can be divided up into before Silvergate and after Silvergate — it's hard to overstate how much it revolutionized banking for blockchain companies. Day in and day out, the Silvergate™ Exchange Network (SEN) proves it is one of the key backbones of the cryptocurrency settlement layer."
>
> — Sam Bankman-Fried
> FOUNDER AND CEO, FTX AND ALAMEDA RESEARCH

22.     Before Silvergate, Bankman-Fried has also said, crypto firms like FTX and Alameda had no access to banks.

23.     Silvergate started in 1988 as a small, Southern California savings and loan.  It became a bank in 1996 but remained small, with just three branches.

24.     In 2013, its CEO, Lane, personally invested in cryptocurrency.  The experience led him to direct the bank into looking at how it might serve the burgeoning crypto industry — an industry that, to this day, the great majority of banks will not touch.  Lane later stated, "What I saw was an opportunity to bank these companies that were essentially being de-risked from other banks."

25. Silvergate's refocusing ultimately resulted in the creation of the Silvergate Exchange Network ("SEN"), a proprietary payment network that provides a very simple yet fundamental service. Like a brokerage network for traditional investments such as stocks, bonds and mutual funds, SEN allows retail investors to buy and sell cryptocurrency 24 hours a day, seven days a week. In other words, it provides everyday investors with an "on-ramp" into a crypto investment, and an "off-ramp" out of it.

26. SEN is one of the largest "on-ramp/off-ramp" networks in crypto. As a result, Silvergate quickly became ubiquitous in the expanding crypto industry, and in 2019 it went public, eventually raising more than $1.3 billion in capital.

27. More importantly, Silvergate's fortunes became entirely dependent on the fortunes of its crypto-industry accountholders, of which FTX was one of the largest, if not the largest. By the time of FTX's bankruptcy, FTX comprised nearly 10% of Silvergate's deposits.

28. Silvergate was not required to, and did not, pay interest to crypto accountholders like FTX and Alameda for their deposits. This allowed Silvergate to invest those deposits in low-risk securities.

29. This business model — taking interest-free deposits and investing them in low-risk securities — generated big profits at low risk to the bank. And it also gave Silvergate a competitive advantage in relation to competing banks that shunned crypto-related deposits. The crypto industry was the key to Silvergate's profitability and success.

30. From 2020 to 2021, deposits from crypto exchanges, miners, custodians and the like rocketed from $2 billion to $10 billion. Silvergate's share price rose from $12 per share to $200 per share, greatly enriching shareholders like Lane.

31. By September 2022, Silvergate had grown its deposits to $11.9 billion, of which 90% came from crypto-related accountholders like FTX and Alameda. Silvergate used those deposits to build an $11.4 billion securities portfolio that, in just

the first three financial quarters of 2022, generated more than $200 million in interest income.

**D.    Silvergate's AML and BSA Processes**

32.    Federal law requires banks like Silvergate to "know their customers" and understand their customers' banking behavior.  Under applicable regulations, a bank must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer."  31 C.F.R. §§ 1020.220(a)(1), (2).  Thus, banks are required to collect information about the holder of each account.  Where an entity opens an account, the bank must obtain information concerning the individuals who control the account.

33.    Customer due diligence requires Silvergate to identify its customers, report indications of suspicious activity and assign a "customer risk rating."  Customer due diligence requires Silvergate to know what business the customer is in, and to understand the types of transactions a customer should, and actually does, make. When monitoring its customers' accounts, Silvergate is obligated to comply with the Bank Secrecy Act (BSA), including regulations broadening its anti-money laundering provisions.  The BSA requires Silvergate to develop, administer and maintain a program to ensure compliance.  The program must be approved by the bank's board of directors and noted in the board meeting minutes.  It must (1) provide for a system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance and (4) provide training for appropriate personnel.

34.    Silvergate must also maintain a customer due diligence program to predict the types of transactions, dollar volume and transaction volume each customer is likely to conduct, thereby providing the bank with a means of identifying unusual or suspicious transactions for each customer.  The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and

CLASS ACTION COMPLAINT FOR DAMAGES

the ability to predict the type and frequency of transactions in which its customers are likely to engage.

35.     Customer due diligence programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid.  Where a customer is determined to be high risk, banks should gather additional information about the customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

36.     Silvergate and its personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering indicia set forth in the Federal Financial Institutions Examination Council's BSA/AML Examination Manual.  These include: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the account holder's business; (4) transfers of funds among related accounts; (5) depositing of funds into several accounts that are later consolidated into a single master account; (6) large fund transfers sent in round-dollar amounts; (7) payments unconnected to legitimate contracts or revenue sources; (8) fund transfers containing limited content or related party information; and (9) an unusually large number of persons or entities receiving fund transfers from one company.

37.     Here, Silvergate engaged in a Know Your Customer analysis of FTX and Alameda and monitored the accounts for anomalous or suspicious behavior. Silvergate collected and reviewed information about their business operations, the source of funds and the purpose of the accounts.

38.     Indeed, Silvergate publicly touted its AML/BSA processes as even more robust than the average bank's.  Silvergate employed twice as many compliance staff as traditional banks of its size.  The bank said it typically took six months to conduct due diligence on crypto exchange clients looking to open up an account.

39.     In SEC filings, Silvergate assured the public that given the high-risk nature of crypto-related enterprises, the bank did extensive due diligence on those customers: "For customers such as exchanges which pose a higher degree for risk or have a higher degree of regulatory obligations, the Company's processes are more extensive and incorporate reputational reviews, reviews of applicable licensing requirements, plans, and status, and reviews of customer policies and procedures regarding the BSA, consumer compliance, information security, Dodd-Frank Act prohibitions against unfair, deceptive, or abusive acts or practices, as well as reviews of transaction monitoring systems and audit results."

40.     Silvergate has acknowledged publicly that it "operates in accordance with the Bank Secrecy Act and the USA PATRIOT Act.  For each and every account, these laws require us to determine the beneficial owner, the source of funds, and the purpose and expected use of funds."

41.     Silvergate has also acknowledged that it monitors transactions within accounts and compares them to the transactions it would expect to see from its accountholders: "Silvergate also monitors transaction activity for every account and identifies activity outside of the expected usage."

42.     Silvergate has acknowledged that when it finds suspicious activity, it must file a SAR: "When we identify certain kinds of activity, we are required to file suspicious activity reports, and we do so routinely.  We have a track record of closing accounts that are used for purposes outside of the expected use."  (This allegation is meant to underscore that Silvergate had AML/BSA processes in place.  This lawsuit is *not* predicated on Silvergate's filing of, or failure to file, a SAR.)

43.     Silvergate looks for, and acts on, red flags: "After accounts are open, we continue to monitor account activity as part of our enhanced due diligence process on each of these accounts and to take action when there are red flags."

44.     Silvergate has also suggested publicly that it has created and applies its own special kind of regulatory compliance review; specifically, that Silvergate is a

1  bank "whose solutions are built on a deep-rooted commitment and proprietary
2  approach to regulatory compliance."

3       45.    And when speaking to potential crypto-related accountholders, Lane has
4  publicly touted those potential accountholders' ability to obtain a "good housekeeping
5  seal of approval" by submitting to Silvergate's "know your customer" processes:  "We
6  joke that we're kind of like the good housekeeping seal of approval.  If you've gone
7  through the rigor of satisfying our KYC, our diligence process, we're intentional about
8  it and you can have confidence that you have an account at Silvergate."

9  **E.       FTX Owed Fiduciary Duties to Its Customers**

10      46.    FTX knew that its customers, including Plaintiff and class members,
11 were relying on FTX to protect the assets they deposited.  They relied on and trusted
12 FTX to do so.

13      47.    Moreover, FTX and Bankman-Fried were aware of and encouraged that
14 reliance and trust.  Time and time again, FTX's principals touted the premium that
15 FTX put on the safety of their customers' assets.  For example, Bankman-Fried
16 tweeted "As always, our users' funds and safety comes first.  We will always allow
17 withdrawals (except in cases of suspected money laundering/theft/etc.)."  He also
18 tweeted that "Backstopping customer assets should always be primary.  Everything
19 else is secondary."

20      48.    FTX also expended large sums of money in an effort to become "the
21 cleanest brand in crypto."  It hired dozens of A-list celebrities and prominent
22 organizations to promote its reputation as "the safest and easiest way to buy and sell
23 crypto."

24      49.    At a hearing before the U.S. House of Representatives Committee on
25 Financial Services, FTX through Bankman-Fried touted FTX's "complete
26 transparency."  Bankman-Fried also touted FTX's technical expertise and its
27 proprietary, automated, internal "risk engine," which was designed and created to
28 keep its customers safe.

-11-

50.     Silvergate knew about FTX's campaign to emphasize the safety and security of its exchange — and of the crypto industry as a whole.  Silvergate knew about the fiduciary duties that arose out of that campaign.

**F.     FTX Is a Massive Fraud Operated Out of the FTX and Alameda Accounts**

51.     From the moment of FTX's creation, FTX breached those duties and perpetrated a multibillion-dollar fraud on its customers, including Plaintiff's and class members.  FTX diverted customer funds to Alameda in what Bankman-Fried's replacement CEO, John Ray III ("Ray"), described as "really old-fashioned embezzlement."

52.     FTX did so in two ways.  It allowed customer funds to be transferred from the FTX account at Silvergate directly to accounts controlled by Alameda at Silvergate.  This created what has been described as a "limitless 'line of credit'" that allowed Bankman-Fried to use FTX customer money to pay down *billions of dollars* in loans taken out by Alameda to fund investments and Bankman-Fried's personal use.

53.     Second, FTX instructed its customers to deposit funds directly into accounts held by Alameda at Silvergate.  *Billions of dollars* of FTX customer funds were received into Alameda accounts in this way.  Some of these bank accounts at Silvergate were in the name of an Alameda subsidiary called North Dimension, Inc. ("North Dimension"), a company that, as Silvergate knew, had no obvious connection to Alameda's hedge-fund business, or to FTX, other than a connection to Bankman-Fried.

54.     All of the FTX customer funds transferred or sent into Alameda accounts at Silvergate were commingled with Alameda's assets.  These commingled funds were then paid out indiscriminately for various purposes.

55.     In the end, approximately *$10 billion* of FTX customer money was improperly sent to accounts at Silvergate controlled by Alameda.  Approximately *$8 billion* of that money was used by Alameda for its own hedge fund trading

purposes, or for the personal benefit of Bankman-Fried, Wang, Singh and others. Bankman-Fried took more than $1.3 billion from the Alameda accounts and spent hundreds of millions more toward luxury real estate, political pet projects and private investments.  Singh took more than $550 million and Wang nearly $225 million.

**G.**   **Defendants Had Actual Knowledge of What FTX, Alameda and Bankman-Fried Were Doing**

56.   None of the FTX customers, including Plaintiff and the class members in this case, knew that their funds were being diverted to Alameda.  For example, Bankman-Fried used the Silvergate-based account of Alameda subsidiary North Dimension as the recipient of direct transfers of money from FTX customers, so that customers would not know the money was going to Alameda.

57.   Defendants, however, did know.  With Silvergate's stringent, months-long "Know Your Customer" processes, Defendants knew exactly what business FTX and Alameda conducted.  They knew that FTX was an exchange that held billions of dollars customer funds in its account at Silvergate.  They knew that Alameda was an entirely separate business, a hedge fund that engaged in speculative, risky, crypto-related trades.

58.   And with Silvergate's stringent account-monitoring procedures, which included proprietary automated processes employed in aid of a large staff of AML/BSA analysts, Defendants also saw the transactions that plainly revealed the fraud.  Defendants saw transfers of *billions of dollars* in funds from the FTX account to the Alameda account.  There exists no legitimate explanation for any of the transfers, much less transfers of the velocity and size that occurred in just a relatively short time — a matter of months.  The frequency and amount of these transfers easily alerted Silvergate's risk department, which was headed by Lane's son-in-law Tyler J. Pearson.  (Pearson was replaced as Silvergate's chief risk officer on November 7, 2022, after FTX began to fail and four days before it filed for bankruptcy.)

59.    Moreover, Defendants through Silvergate's AML/BSA processes saw the *billions of dollars* of fiat currency funds sent directly to Alameda accounts from FTX customers, in relatively small denominations.  These deposits, taken together at a velocity reaching *billions of dollars*, had no legitimate explanation.

60.    Ultimately, about *$10 billion* in FTX customer funds went to the Alameda account, with *$8 billion* unaccounted for.

61.    As CEO of Silvergate Bank and president and director of its parent, Silvergate Capital, Lane obtained AML/BSA information about FTX and Alameda.  Lane developed a relationship with Bankman-Fried and knew that FTX and Alameda were completely separate entities with separate purposes.

**H.    Defendants Substantially Assisted the Fraud**

62.    Despite Defendants' knowledge of the fraud being perpetrated through its FTX and Alameda accounts, they substantially helped FTX, Alameda and Bankman-Fried perpetrate that fraud.  Not only did they continue to allow FTX and Alameda to use Silvergate accounts, Defendants continued to allow FTX to use Silvergate's proprietary SEN network.  This enabled FTX and Bankman-Fried to continue to on-ramp new customers and to allow existing customers to trade cryptocurrency.  In other words, Defendants enabled FTX's very existence through the use of Silvergate's SEN network.

63.    Allowing FTX to continue to use the SEN network also ensured that Silvergate would continue to grow its deposits and generate income from the SEN's use by one of the world's largest cryptocurrency exchanges.  As Silvergate has stated in its securities filings: "The SEN has a powerful network effect that makes it more valuable as participants and utilization increase.  The SEN has enabled us to significantly grow our noninterest bearing deposit product for digital currency industry participants, which has provided the majority of our funding over the last four years. . . .  In addition, use of the SEN has resulted in an increase in noninterest income that we believe will become a valuable source of additional revenue as we

1  develop and deploy fee-based solutions in connection with our digital currency

2  initiative." Silvergate and Lane benefitted financially as a result.

3      64.    Finally, there is no evidence that Defendants ever alerted authorities of

4  what FTX and Alameda were doing.  No regulatory consent order was ever issued

5  against FTX or Alameda before they went bankrupt.

6  **I.    The Fallout**

7      65.    On November 2, 2022, the crypto news website CoinDesk ran a story

8  reporting that Alameda's balance sheet contained large amounts of cryptocurrency

9  tokens associated with or created by FTX, including FTX's proprietary "FTT" token.

10     66.    Because FTT was not widely traded and was mostly held by Bankman-

11  Fried and FTX, this news caused the world's largest crypto exchange, Binance, to

12  liquidate about $500 million of FTT.  This in turn led to a proverbial "run on the

13  bank," causing FTX customers to begin withdrawing significant amounts of money

14  from FTX.

15     67.    At this point, Bankman-Fried knew that FTX would not be able to honor

16  all of the customer withdrawal requests.  He knew that those customers' deposits had

17  been transferred and/or sent to Alameda.  So in an attempt to quell the tide of

18  withdrawals, Bankman-Fried made a series of outrageous lies to the public.

19     68.    On November 7, 2022, he tweeted "FTX is fine.  Assets are fine. . . .

20  FTX has enough to cover all client holdings.  We don't invest client assets (even in

21  treasuries).  We have been processing all withdrawals, and will continue to be . . . ."

22  The tweet was false, and Bankman-Fried later deleted it.

23     69.    On November 8, 2022, FTX paused customer withdrawals, driving

24  down the value of the FTT token — the asset that Bankman-Fried had used as

25  collateral for the $10 billion in "loans" from FTX to Alameda — by 80%.  This

26  obliterated FTX's ability to recover the value of the customer deposits it had sent to

27  Alameda.

28

CLASS ACTION COMPLAINT FOR DAMAGES

70.     Bankman-Fried sought investors, including its main competitor Binance, to bail out FTX.  On November 9, 2022, Binance announced it had conducted due diligence of FTX and decided not to intervene.  FTX customers promptly withdrew $5 billion from the platform that day.

71.     Also that day, Bankman-Fried admitted at a meeting with Alameda employees that he, Wang and Singh knew that FTX customer funds had been sent to and used by Alameda.

72.     On November 10, 2022, Bankman-Fried acknowledged it to the world, tweeting, "1) I'm sorry.  That's the biggest thing.  I f*cked up, and should have done better."

73.     On November 11, 2022, Bankman-Fried resigned from FTX.  FTX, Alameda and about 100 affiliates filed for Chapter 11 bankruptcy protection later that day.

74.     Within days, Ray was appointed the new CEO of FTX.  On November 17, 2022, he filed a Declaration in support of the bankruptcy.  Ray, who held the same position following the Enron financial catastrophe, stated "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here.  From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented."  Ray also reported that FTX did not conduct board meetings.

75.     On December 13, 2022, Ray testified before the House Financial Services Committee.  He stated that "This is just old fashioned embezzlement, taking money from others and using it for your own purposes.  This is not sophisticated at all."

76.     Ray also stated that FTX's domestic and international entities did not operate independently of each other.

77.     Ray stated that FTX's computer infrastructure allowed senior management to access customer assets without security protocols in place to prevent those assets from being redirected, and that Alameda borrowed FTX client funds for use in Alameda's trading and investments, without limits.  Alameda traded those funds on margin and suffered disastrous losses.

78.     Ray also stated that assets were commingled in the FTX and Alameda accounts (which again, were held at Silvergate); that no reliable financial statements existed; that FTX lacked personnel in financial and risk management functions; and that FTX lacked independent governance.

79.     On December 13, 2022, the SEC sued Bankman-Fried, alleging securities fraud.

80.     That same day, the CFTC sued Bankman-Fried, FTX and Alameda for fraud as well.

81.     On December 14, 2022, Bankman-Fried was indicted in the U.S. District Court for the Southern District of New York and charged with eight counts of fraud. He was arrested in the Bahamas and awaits extradition to the United States to face the charges.

82.     Silvergate's actions have drawn attention from the government as well. On December 5, Senators Elizabeth Warren (D-Mass.), Roger W. Marshall (R-Kan.) and John Kennedy (R-La.), sent Lane and Silvergate a letter voicing "concern[ ] about Silvergate's role in [FTX's] activities because of reports suggesting that Silvergate facilitated the transfer of FTX customer funds to Alameda."  Silvergate's response to that letter was described by the Senators as "disappoint[ing], . . . evasive and incomplete."

83.     And as Defendants knew it would if news of FTX's fraud became public, Silvergate's financial fortunes have dropped precipitously.  By January 5, 2023, Silvergate lost more than $8 billion of its $12 billion in deposits.  And its stock price plummeted almost 80% since that news broke in November 2022.

**J.    Lane as Agent and Co-Conspirator**

84.    At all relevant times, Silvergate, Bankman-Fried and Lane were principals, agents, joint venturers, partners and/or affiliates of each other.  They each acted within the course and scope of that principal, agent, joint venture, partnership and/or affiliate relationship.  Silvergate, Bankman-Fried and Lane had mutual knowledge of each other's wrongdoing.  They each ratified, approved, joined in, acquiesced, or authorized the wrongful acts of Silvergate, Bankman-Fried and Lane, and retained the benefits of those wrongful acts.

85.    At all relevant times, Silvergate, Bankman-Fried and Lane were each co-conspirators of the other.  Silvergate and Lane aided and abetted, encouraged and substantially assisted Bankman-Fried in jointly perpetrating a fraudulent scheme upon Plaintiff and the class.  By aiding, abetting, encouraging and substantially assisting the wrongful acts, omissions and other misconduct alleged above, Defendants acted with an awareness of their wrongdoing and realized that their conduct would substantially aid the accomplishment of their illegal design.

**K.    Tolling of Statutes of Limitation**

86.    Defendants Silvergate and Lane fraudulently concealed from Plaintiff and the other FTX customers the true nature of FTX.  Silvergate and Lane were aware of the illegal FTX scheme whereby FTX customer money was embezzled by Alameda.  They were aware that it would injure Plaintiff and the class members.  But Defendants took no action to stop or report it.  Instead, Silvergate continued accepting FTX deposits and executing the transfer and lending transactions upon which the scheme relied.  Silvergate and Lane knew that FTX investors like Plaintiff were unaware of the FTX/Alameda investment fraud.  Silvergate and Lane had superior and exclusive knowledge of the fraud.

87.    Plaintiff did not discover, and although exercising reasonable diligence could not have discovered, the facts establishing Defendants' violations or the harm

caused until FTX's bankruptcy in early November 2022. Plaintiff learned about the scheme through media coverage and FTX's bankruptcy filing.

88.     Because Plaintiff and the other class members could not have reasonably discovered the facts constituting Silvergate's and Lane's violations until November 2022, all applicable statutes of limitation were tolled until then.

## CLASS ACTION ALLEGATIONS

89.     Plaintiff brings this lawsuit as a class action on behalf of himself and all others similarly situated who, as of November 11, 2022, held legal title to any fiat or cryptocurrency deposited or invested through an FTX platform.

90.     Excluded from the class are Silvergate and its employees, affiliates, predecessors, successors or assigns; Alan Lane or his immediate family members; Samuel Bankman-Fried or his immediate family members; Gary Wang or his immediate family members; Nishad Singh or his immediate family members; Plaintiff's counsel; as well as the Judge to whom the Action is assigned and any member of the Judge's staff and immediate family.

91.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, because it meets all the requirements of Rule 23(a)(1)-(4), including the numerosity, commonality, typicality and adequacy requirements, and it satisfies the requirements of Rule 23(b)(3) in that the predominance and superiority requirements are met.

92.     <u>Numerosity</u>.  The members of the Classes are so numerous that joinder of all members is impracticable.  FTX had more than one million users at the time of its bankruptcy who held legal title to currency fiat or cryptocurrency on the FTX exchanges.

93.     <u>Commonality</u>.  There are numerous questions of fact or law that are common to Plaintiff and all the members of the Class.  Common issues of fact and law predominate over any issues unique to individual class members.  Issues that are common to all class members include, but are not limited to the following:

a. Whether Bankman-Fried and/or FTX committed fraud or breached fiduciary duties to the class;

b. Whether Bankman-Fried and/or FTX had fiduciary duties to Plaintiff and members of the class;

c. Whether Bankman-Fried and/or FTX breached their fiduciary duties to Plaintiff and members of the class;

d. Whether Silvergate had actual knowledge of the scheme by FTX, Alameda and Bankman-Fried to transfer and/or FTX customer funds to Alameda;

e. Whether Silvergate, despite actual knowledge of the scheme, substantially assisted it;

f. Whether Silvergate was unjustly enriched by its wrongful conduct; and

g. Whether Class Plaintiff and class members suffered damages or are entitled to restitution.

94.   <u>Typicality</u>.  Plaintiff has claims that are typical of the claims of all of the members of the Class.  Plaintiff and each class member invested through the FTX exchange and were subject to the wrongful conduct alleged in this complaint. Furthermore, the claims arise under legal theories that apply to Plaintiff and all other class members.

95.   <u>Adequacy of Representation</u>.  Plaintiff will fairly and adequately represent the interests of the members of the Classes.  Plaintiff does not have claims that are unique to Plaintiff and not the other class members, nor are there defenses unique to Plaintiff that could undermine the efficient resolution of the claims of the Class.  Further, Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in class action litigation, to represent Plaintiff.  There is no hostility between Plaintiff and the unnamed class members.

CLASS ACTION COMPLAINT FOR DAMAGES

1    Plaintiff anticipates no difficulty in the management of this litigation as a class

2    action.

3        96.    Predominance.  Common questions of law and fact predominate over

4    questions affecting only individual class members.  The only individual issues

5    likely to arise will be the amount of damages to be recovered by each class

6    member, the calculation of which does not bar certification.

7        97.    Superiority.  A class action is superior to all other feasible alternatives

8    for the resolution of this matter.  Individual litigation of multiple cases would be

9    highly inefficient and would waste the resources of the courts and of the parties.

10   The damages sought by Plaintiff and class members are relatively small and

11   unlikely to warrant individual lawsuits given the fees and costs, including expert

12   costs, required to prosecute the claims.

13       98.    Manageability.  This case is well suited for treatment as a class action

14   and easily can be managed as a class action because evidence of both liability and

15   damages can be adduced, and proof of liability and damages can be presented, on a

16   class-wide basis, while the allocation and distribution of damages to class members

17   would be essentially a ministerial function.

18       99.    Ascertainability.  Class members are readily ascertainable.  The class

19   members are readily identifiable from information and records in the possession,

20   custody or control of Silvergate and/or the bankruptcy trustee of FTX.

21       100.   All conditions precedent to this action have occurred or have been

22   waived.

23                                **COUNT 1**

24              **Aiding and Abetting Fraud Against All Defendants**

25       101.   Plaintiff re-alleges and incorporate paragraphs 1 through 100 above as

26   if fully set forth herein.

27       102.   As set forth above, Bankman-Fried and FTX perpetrated a fraud upon

28   Plaintiff and class members through materially false and misleading statements and

-21-

omissions that misled Plaintiff and class members about the nature of FTX investments and how investor money would be used. The Bankman-Fried and FTX knew these statements to be false.

103. Plaintiff and class members reasonably relied to their detriment upon those misrepresentations when they invested with FTX.

104. Silvergate substantially assisted the fraud perpetrated by FTX and Bankman-Fried, with knowledge that they were defrauding investors like Class Plaintiff and class members. In connection with providing substantial and material assistance to the Bankman-Fried and FTX, Silvergate knew of its role in their scheme, and acted knowingly in assisting.

105. Silvergate substantially benefited from its participation in the scheme.

106. As a direct and proximate result of Silvergate aiding and abetting the fraud, Plaintiff and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiff, on behalf of himself and all similarly situated class members, respectfully demand judgment against Silvergate for their damages; pre- and post-judgment interest; punitive damages; and such other and further relief as the Court deems just and proper.

## COUNT 2

### Aiding and Abetting Breach of Fiduciary Duty Against All Defendants

107. Plaintiff re-alleges and incorporates paragraphs 1 through 100 above as if fully set forth herein.

108. Bankman-Fried and FTX fostered a special relationship with Class Plaintiff and class members that engendered fiduciary duties of loyalty, care, honesty and/or good faith. They had a duty to act for the benefit of Class Plaintiff and class members upon matters within the scope of their relationship, which included the duty to take Plaintiff's and class members' money and use those funds as promised.

109.   Bankman-Fried and FTX breached their fiduciary duties by misappropriating, commingling and otherwise misusing investor funds, and otherwise acting as alleged herein in violation of his fiduciary duties to investors.

110.   Through its knowledge of FTX and Alameda's public statements, business models and banking activity, Silvergate knew that FTX and Bankman-Fried owed fiduciary duties to investors, including Plaintiff and the class, and that they were breaching those fiduciary duties.

111.   Silvergate substantially assisted in the breaches of fiduciary duty with knowledge that Bankman-Fried and FTX were breaching those duties.

112.   As a direct and proximate result of Silvergate's aiding and abetting Bankman-Fried and FTX's breaches of fiduciary duty, Plaintiff and class members have suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiff, on behalf of himself and all similarly situated class members, respectfully demand judgment against Silvergate for their damages, including but not limited to profits made by Silvergate relating to Bankman-Fried, FTX, and Alameda, their principals or employees; pre- and post-judgment interest; punitive damages; and such other and further relief as the Court deems just and proper.

## COUNT 3

### Unjust Enrichment Against Silvergate

113.   Plaintiff re-alleges and incorporate paragraphs 1 through 100 above as if fully set forth herein.

114.   Silvergate provided banking services to Bankman-Fried, FTX and Alameda through various bank accounts.  Those bank accounts were used to carry out the fraudulent scheme.

115.   Class Plaintiff and class members conferred benefits on Silvergate by depositing funds into and using the FTX exchange platforms.

CLASS ACTION COMPLAINT FOR DAMAGES

116.   The funds held in FTX's accounts belonged to investors.  Thus, Plaintiff and class members conferred benefits upon Silvergate in the form of deposits from which Silvergate generated income, including but not limited to revenues derived from Class Plaintiff's and other class members' funds, interest, transfer fees, service fees, transaction fees and online banking fees.  Silvergate knowingly and voluntarily accepted, and retained, the deposits and those benefits.

117.   Because Silvergate aided and abetted the Bankman-Fried and FTX's fraud and breach of fiduciary duty, it would be inequitable for Silvergate to retain the benefits it generated from monies of Class Plaintiff and class members.

WHEREFORE, Plaintiff, on behalf of himself and all similarly situated class members, respectfully demands judgment against Silvergate for the return of income and fees retained by Silvergate; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Silvergate, as follows:

1.     Certifying this action as a class action, appointing Plaintiff as class representative and their lawyers as class Counsel and requiring Silvergate to pay the costs of notice to the class;

2.     Awarding damages, restitution and/or disgorgement of profits, including prejudgment interest, upon each count in an amount to be determined at trial;

3.     Awarding reasonable attorneys' fees and costs of litigation; and

4.     Granting such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

CLASS ACTION COMPLAINT FOR DAMAGES

Dated: February 14, 2023

By: */s/ Michael J. Reiser*

Michael J. Reiser
Matthew Reiser
Isabella Martinez
**REISER LAW, p.c.**
1475 N. Broadway, Suite 300
Walnut Creek, California 94596
Telephone: (925) 256-0400
michael@reiserlaw.com
matthew@reiserlaw.com
isabella@reiserlaw.com

Jason Kellogg, Esq.
Victoria J. Wilson, Esq.
Marcelo Diaz-Cortes, Esq.
**LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP**
100 Southeast Second Avenue
36th Floor
Miami, Florida 33131
Telephone: (305) 403-8788
jk@lklsg.com
vjw@lklsg.com
jk@lklsg.com
(Pro Hac Vice Applications Forthcoming):

CLASS ACTION COMPLAINT FOR DAMAGES