1    *[Counsel on Signature Page]*

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                  **NORTHERN DISTRICT OF CALIFORNIA**

10

11   IN RE:                              Case No. 3:23-cv-00667-JSC

12   SILVERGATE CAPITAL CORPORATION      **CONSOLIDATED CLASS ACTION**
                                         **COMPLAINT**
13
                                         DEMAND FOR JURY TRIAL
14
                                         HON. JACQUELINE SCOTT CORLEY
15
                                         [COMPLAINT FILED: FEBRUARY 14, 2023]
16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs Joewy Gonzalez, Nicole Keane, Matson Magleby, and Golam Sakline, on behalf of themselves and all others similarly situated, bring this action against Defendants Silvergate Bank and Silvergate Capital Corporation ("Silvergate Capital" and with Silvergate Bank, "Silvergate"), and Alan J. Lane ("Lane"), and allege as follows.

## INTRODUCTION

1.     Unlike other banks, Silvergate courted cryptocurrency businesses as customers—notwithstanding those businesses' lack of transparency, regulatory uncertainty, volatility, and other risks. As Alan Lane, Silvergate's founder and CEO, put it, Silvergate was "all-in" on crypto, and crypto customers accounted for as much as 99% of deposits. By catering to cryptocurrency-related exchanges, funds, and customers, Silvergate quickly emerged from a small regional bank into a national bank with more than $12 billion in interest-free deposits that generated hundreds of millions of dollars in revenue for the bank.

2.     Silvergate's best customers were the cryptocurrency exchange FTX and its affiliates, including the cryptocurrency trading firm Alameda Research ("Alameda"), all controlled by Samuel Bankman-Fried ("SBF"). Silvergate embraced SBF and his companies, which accounted for almost 10% of Silvergate's business. Silvergate developed a proprietary, instantaneous payment network geared to crypto customers, the Silvergate Exchange Network (the "SEN"). The SEN drove new deposits to Silvergate and new business to FTX. As crypto gathered momentum, SBF and Lane joined in extolling the benefits of the SEN, and Silvergate featured SBF's endorsement on Silvergate's website.

3.     FTX collapsed in November 2022. As FTX was toppling, SBF admitted diverting billions in customer money to Silvergate bank accounts controlled by Alameda, where it was dissipated and lost. Silvergate, which publicly touted its enhanced proprietary anti-money laundering and "Know Your Customer" systems, knew about the scheme. It saw FTX customer money being deposited in accounts at Silvergate titled, not in the name of FTX, but in the names of other companies under SBF's control such as Alameda. But Silvergate accepted Plaintiffs' money and executed the transfers by which the money was diverted and dissipated anyway. Silvergate and Lane provided these services

even after SBF and his entourage moved offshore to evade U.S. government oversight, and despite numerous unexplained related party transactions and other red flags: Alameda had nonexistent internal controls, no credible financial statements, no auditor, no meaningful risk management or compliance functions, no regard for corporate formalities or corporate governance norms, and the behavior of its youthful principals was unorthodox, bordering on bizarre.

4.     The revelation that FTX had diverted customer money in Silvergate prompted a run on Silvergate deposits, leading to Silvergate record a $1 billion dollar loss and enter voluntary liquidation. To date, Silvergate has failed to account for its actions and inactions, even in response to a demand from Congress. Plaintiffs sue on behalf of themselves and all others similarly situated, seeking answers and compensation for their losses from Silvergate Bank, its parent company Silvergate Capital, and its CEO Lane.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), the Class Action Fairness Act, because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the proposed plaintiff class is a citizen of a State different from a Defendant.

6.     The Court has personal jurisdiction over Defendants based on their substantial, continuous, and systematic contacts with California and because Defendants have purposely availed themselves of the benefits and privileges of conducting business activities within the State. In particular, Defendants are headquartered or reside in California and Defendant Silvergate Bank is a California-chartered bank.

7.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District. FTX and Alameda were founded in this District and headquartered in this District until 2019, when they moved to Hong Kong and later to The Bahamas. The decisions to divert FTX customer funds to Alameda accounts were made in this District and the actions effecting those decisions were taken in this District. SBF and other witnesses are located in this District. Defendants also have substantial, continuous, and systematic

contact with this District through the marketing and provision of its banking and SEN services to many businesses and individuals that reside in this district.

## INTRADISTRICT ASSIGNMENT

8.     Pursuant to N.D. Cal. Civ. L.R. 3-2(c), (d) & 3-5(b), this action is properly assigned to the San Francisco division because a substantial part of the events and omissions which give rise to the claim occurred in Alameda County.

## PARTIES

### A.     Plaintiffs

9.     Plaintiff Joewy Gonzalez is a citizen and resident of Revere, Massachusetts. Starting in November 2021, Plaintiff placed funds in an FTX account at Silvergate in anticipation of executing cryptocurrency trades, engaging in investment activity. After FTX announced its bankruptcy, Plaintiff attempted to withdraw the assets in his FTX account but was unable to do so.

10.     Plaintiff Nicole Keane is a citizen of Alaska and resides in Oregon. She placed funds in an FTX account. To do so, she wired her money into a Silvergate bank account. Prior to FTX announcing its bankruptcy, Ms. Keane attempted to withdraw fiat currency from her FTX account but was unable to do so.

11.     Plaintiff Matson Magleby is a citizen and resident of Utah. He committed funds to FTX in anticipation of executing cryptocurrency trades. When he did so, he wired his money into a Silvergate bank account. After FTX announced its bankruptcy, Mr. Magleby attempted to withdraw the assets in his FTX account but was unable to do so.

12.     Plaintiff Golam Sakline is a citizen of the United Kingdom of Great Britain and Northern Ireland and resides in the United Arab Emirates. He committed funds to FTX through an account at Silvergate in anticipation of executing cryptocurrency trades. When he did so, he wired his money into a Silvergate bank account. Mr. Sakline has been unable to withdraw the assets in his FTX account.

**B.      Defendants**

13.      Defendant Silvergate Bank is a California corporation with its principal place of business in La Jolla, California. Silvergate Bank announced its intent to enter voluntary liquidation on March 8, 2023, and closed all non-CD Silvergate Bank accounts on March 31, 2023.

14.      Defendant Silvergate Capital Corporation is a federally-registered bank holding company incorporated in Maryland, with its principal place of business in La Jolla, California. Silvergate Bank is a wholly-owned subsidiary of Silvergate Capital Corporation. Silvergate Capital is sued in its capacity as 100% shareholder controlling Silvergate Bank, at all relevant times exercising voting control over a majority of the outstanding stock of Silvergate Bank.

15.      Defendant Alan J. Lane was at all relevant times President and Chief Executive Officer of Silvergate Capital, Chief Executive Officer of Silvergate Bank, and a member of Silvergate Capital's board of directors. At all relevant times, Lane managed the day-to-day operations of Silvergate. Lane resides in Temecula, California.

## STATEMENT OF FACTS

**A.      Silvergate Was Required to Monitor Customer Behavior**

16.      Silvergate is obligated to comply with the Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.* ("BSA"), including regulations broadening its anti-money laundering provisions. Silvergate has obligations under the BSA as both a "bank" and a "money transmitter."[1]

17.      The BSA and its implementing regulations require a bank like Silvergate to develop, implement, and maintain an effective Anti-Money Laundering (AML) program that is reasonably designed to prevent the bank from being used to facilitate money laundering and the financing of terrorist activities. *See* 31 U.S.C. § 5318(h)(1); 31 C.F.R. § 1020.210(a).

18.      The AML program must include: (a) assessing the money laundering risk presented by any foreign financial institution correspondent account (which includes Alameda and FTX accounts,

---

[1] Plaintiffs' claims are not based on whether Silvergate filed or failed to file a Suspicious Activity Report pursuant to the Bank Secrecy Act or reported or failed to report any FTX or Alameda act or omission to any regulatory agency.

*see* 31 C.F.R. § 510.309) based on, among other things, its business and the markets it serves, its anticipated activity, and the nature and duration of its relationship with the bank; and (b) applying risk-based procedures and controls designed to detect money laundering activity, including through a periodic review of account activity sufficient to determine its consistency with expected activity.

19. Additionally, Silvergate must maintain a due diligence program. *See* 31 C.F.R. § 1010.620(a); *see also id.* § 1020.210(a)(1) (requiring banks to "[c]ompl[y] with the requirements of §§ 1010.610 and 1010.620 of this chapter"). This program must be:

designed to ensure, at a minimum, that [Silvergate] takes reasonable steps to:

(1) Ascertain the identity of all nominal and beneficial owners of a private banking account . . .

(3) Ascertain the source(s) of funds deposited into a private banking account and the purpose and expected use of the account; and

(4) Review the activity of the account to ensure that it is consistent with the information obtained about the client's source of funds, and with the stated purpose and expected use of the account, as needed to guard against money laundering, and to report, in accordance with applicable law and regulation, any known or suspected money laundering or suspicious activity conducted to, from, or through a private banking account.

*Id.* § 1010.620(b).

20. As part of ordinary due diligence, banks like Silvergate routinely search the Web and available commercial and government databases for negative information on their customers. This includes press accounts, social media, litigation filings, government enforcement orders available online, and anything Silvergate could have discovered through a typical internet search.

21. Silvergate's AML program must also include, among other things:

Appropriate risk-based procedures for conducting ongoing customer due diligence, to include, but not be limited to: (A) Understanding the nature and purpose of customer relationships for the purpose of developing a customer risk profile; and (B) Conducting

ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to

maintain and update customer information[.]

31 C.F.R. § 1020.210(a)(3)(v).[2]

22.     Through its operation of the SEN, Silvergate is a "money transmitter" as defined by the

BSA and its implementing regulations. *See* 31 C.F.R. § 1010.100(ff). As such, Silvergate is required to

comply with BSA regulations applicable to money transmitters. *See generally* 31 C.F.R. § 1022 ("Rules

for Money Services Businesses").

23.     In addition to developing, implementing, and maintaining an effective anti-money

laundering program, applicable regulations require Silvergate to integrate its compliance procedures

into any automated data processing systems it uses (such as the SEN). *See* 31 C.F.R. § 1022.210(d).

24.     The Bank Secrecy Anti-Money Laundering Manual promulgated by the Federal

Financial Institutions Examination Council (FFIEC Manual) summarizes the applicable anti-money

laundering compliance program requirements, expectations for risks and risk management, industry

sound practices, and examination procedures.

25.     Silvergate must maintain procedures that allow it to "form a reasonable belief that it

knows the true identity of each customer." 31 C.F.R. §§ 1020.220(a)(1), (2); 12 C.F.R. § 21.21.

Customer due diligence programs must be tailored to the risk presented by particular customers, such

that the higher the risk presented, the more attention is paid. Where a customer is determined to be high

risk, the anti-money laundering guidelines direct federally regulated banks like Silvergate to gather

additional information about the customer and its accounts, including determining the: (1) reasons for

the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4)

explanations for changes in account activity.

26.     Moreover, Silvergate and its personnel must identify and take appropriate action once on

notice of any money-laundering "red flags" set forth in the FFIEC Manual. Among these are: (1) funds

---

[2] "Legal entity customer means a corporation, limited liability company, or other entity that is created by the filing of a public document with a Secretary of State or similar office, a general partnership, and any similar entity formed under the laws of a foreign jurisdiction that opens an account." 31 C.F.R. § 1010.230(e).

transfers sent in large, round dollar amounts; (2) funds transfers to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations; (3) frequent involvement of multiple jurisdictions or beneficiaries located in higher-risk offshore financial centers; (4) repetitive or unusual funds transfer activity; (5) funds transfers sent or received from the same person to or from different accounts; (6) unusual funds transfers among related accounts or among accounts that involve the same or related principals; (7) transactions inconsistent with the account holder's business; (8) customer use of a personal account for business purposes; (9) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; and (10) multiple high-value payments or transfers between shell companies without a legitimate business purpose.

27.     In addition, federal law requires Silvergate to conduct "enhanced" due diligence when establishing or maintaining a correspondent account for a financial institution that operates under an offshore license (as FTX did) or is incorporated in a jurisdiction known for failing to conform with international anti-money laundering principles (as FTX was, having certain entities incorporated in the Bahamas).

28.     The FFIEC Manual also identifies "lending activities" and "nondeposit account services," including for nondeposit investment products, as services requiring enhanced due diligence and carrying a high risk of money laundering because they facilitate a higher degree of anonymity and involve high volumes of currency. Therefore, when investment trading or lending services are being run through a bank, the FFIEC Manual requires heightened due diligence including determining the purpose of the account, ascertaining the source and funding of the capital, identifying account control persons and signatories, scrutinizing the account holders' business operations, and obtaining adequate explanations for account activities.

29.     When a bank detects improper conduct, it must take appropriate actions, up to and including closing the account. For example, Silvergate's Customer Identification Program (CIP) must identify when it should close an account after detecting suspicious activity or after attempts to verify a customer's identity have failed.

### B.   The Cryptocurrency Industry

30.   Cryptocurrency is a form of digital currency that first came to prominence in 2008, when an author under the pseudonym Satoshi Nakamoto published the whitepaper *Bitcoin: A Peer-to-Peer Electronic Cash System*. It is contrasted with fiat currency, which is issued by a government as legal tender. Cryptocurrency comes in several types.

31.   One type of cryptocurrency is a "coin." Cryptocurrency "miners" obtain coins by solving complex math problems that allow one block of crypto transactions to be verified and linked to previous blocks, forming a chain (giving rise to the term "blockchain" for the technology underlying cryptocurrency). The process of verifying a block for insertion into the chain is time- and resource-intensive, and miners usually use specialized hardware in large farms of computers. Successful miners are rewarded with coins and transaction fees.

32.   Many cryptocurrency coins can fluctuate in value. But "stablecoins" are specific types of coins designed to remain stable in value. In general, stablecoins purportedly achieve stability by being pegged to some underlying store of value. For example, a stablecoin issuer might place $1 billion in a bank account and then issue one billion $1 of stablecoins effectively underwritten by the fiat asset.

33.   Many stablecoins are pegged to fiat currency (and several are pegged 1-to-1 to U.S. dollars specifically), but others are backed by portfolios of currencies, commercial paper, and other financial assets. Purported stablecoins not backed by any traditional financial assets have also been developed.

34.   Another type of common blockchain-based digital asset is called a "token." Unlike coins, tokens are commonly said to be created by an issuer "out of thin air"—i.e., by the decision of the issuer, rather than by solving complex math problems. Tokens may provide access to certain services or products or may represent voting rights in a specific crypto digital network, known as an ecosystem.

35.   Today, the primary way people buy cryptocurrency is through cryptocurrency exchanges. These are companies like Coinbase and Kraken (and previously FTX) that accept regular currency in exchange for cryptocurrency. In other words, a customer wires an amount of money to an

exchange, and the exchange provides a way to obtain title to a corresponding amount of cryptocurrency (a process known as "on-ramping").

36.     Cryptocurrencies (both coins and tokens) must be stored in digital "wallets." These are applications that store the passkeys (i.e., private codes) used by owners to engage in cryptocurrency transactions. Digital wallets also provide the interface that lets owners access and transfer their digital assets.

37.     Wallets may be "hot" or "cold." A hot wallet is connected to the internet. A cold wallet is offline. Typically, hot wallets are used for day-to-day trading and operations, while cold wallets are used for longer-term secure storage.

38.     Cryptocurrency has rapidly gained value over the past decade while experiencing high volatility. When Nakamoto's paper was first published, one Bitcoin—the original cryptocurrency—was worth zero dollars. In November 2021, one Bitcoin was worth more than $67,000. By early May 2023, the value of one Bitcoin had fallen to below $29,000.

39.     New forms of cryptocurrency have proliferated since the advent of Bitcoin, many of which have been even more volatile than Bitcoin. FTT, the FTX token, was worth over $77 in September 2021. On May 1, 2023, FTT was worth $1.45.

40.     The value of nearly every cryptocurrency declined starting in the first half of 2022 and continuing through the end of the year. This period is often termed the "crypto winter," or sometimes the "2022 crypto winter" to distinguish it from previous market downturns.

41.     The cryptocurrency market has been a hotbed of crime and scam artists. In 2014, the largest Bitcoin exchange, Mt. Gox, abruptly shut down amid revelations of its involvement in the loss or theft of hundreds of thousands of Bitcoins, then worth hundreds of millions of U.S. dollars. In January 2018, the trading platform Bitconnect, which at its peak had a market capitalization of $3.4 billion, was revealed to be a Ponzi scheme and collapsed. On February 24, 2022, the Government Accountability Office reported, "Drug and human traffickers use virtual currency and peer-to-peer mobile payments because transactions are somewhat anonymous, making detection more difficult."

C.     **Silvergate Goes All-In on Crypto**

42.     Silvergate was founded in 1988 as a small industrial loan company with three branches in Southern California. For years, Silvergate provided traditional financial services. In the 2010s, however, Silvergate increasingly began to focus on cryptocurrency. According to Silvergate, it "began exploring the digital currency industry in 2013 based on market dynamics" that it "believed were highly attractive," namely that: (1) the digital currency industry was a "[s]ignificant and [g]rowing [i]ndustry" that "presented a revolutionary model for executing financial transactions"; (2) the industry had "[i]nfrastructure [n]eeds," because "[i]n order to become widely adopted, digital currency would need to rely on many traditional elements of financial services, including those services that support funds transfers, customer account controls and other security measures[;]" and (3) there was "[r]egulatory [c]omplexity as a [b]arrier to [e]ntry" such that "[p]roviding infrastructure solutions and services to the digital currency industry would require specialized compliance capabilities and a management team with a deep understanding of both the digital currency and the financial services industries."

43.     Moreover, Silvergate said its customer base had "grown rapidly, as many customers proactively approach us due to our reputation as the leading provider of innovative financial infrastructure solutions and services to participants in the digital currency industry, which includes our unique technology solutions."

44.     Silvergate's CEO, Lane, personally directed Silvergate's move into serving the burgeoning crypto industry—an industry that, to this day, the great majority of banks will not service due to its risks. Lane later stated: "What I saw was an opportunity to bank these companies that were essentially being de-risked from other banks."

45.     In a June 2022 interview, Lane explained that Silvergate "really focused on this new digital asset called Bitcoin and some of the companies that were being formed at the time to provide services to this budding Bitcoin space." He said that "many of them were struggling to find and maintain bank accounts," and "[s]o the first thing we did . . . is we were just a bank willing to talk to these new companies."

46.     In a separate interview, Lane explained that Silvergate's entrance into cryptocurrency was catalyzed by the need to grow deposits in order to fund its lending activities.

We were looking for deposit niches for the bank, and I was reading about Bitcoin, and I was reading that there were companies that were being formed to provide infrastructure to this new thing called Bitcoin . . . . And so I learned that there were companies that were raising venture money, so they had deposits. They wanted to put them in a bank— Silvergate's a bank—and they were getting kicked out of their banks . . . . Obviously there was a reason that they were getting kicked out, and it was the perception of risk.

47.     Lane further explained that one of the reasons that crypto companies were perceived as risky was "because of the whole concern about anti-money laundering, BSA": the "[b]ig concern that the primary use case for Bitcoin at the time was for nefarious activity. . . ." Aware of this concern, Lane asked Silvergate's compliance officer: "Do you think we can figure out how to bank these companies, because it might be a source of deposits?"

48.     Despite knowing the significant risks associated with providing banking services to crypto firms, Silvergate rapidly became a cryptocurrency-focused bank. According to an analyst report issued shortly before Silvergate went public, by 2018, "[t]he majority of Silvergate's funding [came] from noninterest-bearing deposits associated with clients in the digital currency industry."

49.     In information that Silvergate released with its initial public offering, Silvergate wrote that it was the "leading provider of innovative financial infrastructure solutions and services to participants in the nascent and expanding digital currency industry."

50.     On November 15, 2018, Silvergate entered into an agreement to sell its small business lending division and retail branch located in San Marcos, California, to another bank. In a securities filing, Silvergate stated that this transaction enabled it "to increase its focus on its digital currency initiative and its specialty lending competencies." As Lane put it, Silvergate was "all in" on crypto.

51.     In November 2019, Silvergate went public. Silvergate's New York Stock Exchange ticker symbol was "SI." In its Registration Statement, Silvergate described itself as "the leading provider of innovative financial infrastructure solutions and services to participants in the nascent and

expanding digital currency industry," and claimed to have "a first-mover advantage within the digital currency industry that is the cornerstone of [its] leadership position today."

52.     The Registration Statement included the following graphic depicting the growth of Silvergate's cryptocurrency business into 2018:



**Figure 1**

53.     This growth continued. From 2020 to 2021, deposits from crypto exchanges, miners, custodians, and the like increased fivefold from $2 billion to $10 billion.  Silvergate's share price rose from $12 per share to $200 per share, greatly enriching shareholders like Lane.

54.     By 2022, Silvergate had $11.9 billion in deposits and over 1,600 crypto clients, including Coinbase, Paxos, Circle, Kraken, Bitstamp, Gemini, and Crypto.com.

55.     Silvergate used those deposits to build an $11.4 billion securities portfolio that, in just the first three financial quarters of 2022, generated more than $200 million in interest income.

56.     According to Silvergate: "These market participants generally hold either or both of two distinct types of funds: (i) those funds that market participants use for digital currency investment activities, which [Silvergate] refer[s] to as investor funds, and (ii) those funds that market participants use for business operations, which [Silvergate] refers to as operating funds."

### D.     The Silvergate Exchange Network

57.     According to Silvergate's public filings with the SEC: "Instrumental to [its] leadership position and growth strategy is the Silvergate Exchange Network, or SEN, [Silvergate's] proprietary,

virtually instantaneous payment network for participants in the digital currency industry . . . ." The SEN was designed to, and did, bring new customers to the crypto market by speeding up transactions involving cryptocurrency and fiat currency, such as buying Bitcoin with U.S. dollars. The SEN's ease of on-ramping was a key part of FTX's growth.

58.     The SEN only transfers fiat currency such as U.S. dollars or euros, not cryptocurrency, but it was designed to facilitate crypto transactions. Before the SEN, a transaction involving both cryptocurrency and fiat currency typically was slow and burdensome. Cryptocurrency exchanges, such as FTX, allowed participants to transfer cryptocurrency nearly instantaneously and at any time, but banks' traditional ways of transferring fiat currency, such as wires or ACH transfers, took hours or days to complete and closed only within traditional banking hours to allow for banking due diligence. Hence, transactions involving crypto and fiat assets proceeded slowly and on traditional banking timelines.

59.     In addition to being cumbersome, the slowness of crypto/fiat transactions created other problems. For example, crypto assets fluctuate in value frequently. Transactions that made economic sense at the time that they were arranged may not make sense days later, when they close. Other financial assets that fluctuate in value frequently, such as stocks, can be traded almost instantaneously. But crypto often could not. And, unlike stocks, crypto markets are open 24 hours a day.

60.     The friction involved in crypto/fiat transactions was a significant barrier for widespread adoption of cryptocurrency because, by definition, all on-ramping transactions involve both cryptocurrency and fiat currency.

61.     In 2017, Silvergate introduced the SEN to eliminate this friction. The SEN was a "proprietary, virtually instantaneous payment network for participants in the digital currency industry." Silvergate introduced the SEN "in response to unmet demand for U.S. dollar deposit accounts for many [digital asset] market participants." It allows a bank's participating customers to send money instantaneously to other SEN participants at any time, in part by eliminating the due diligence time built into traditional bank transfers. Due in large part to the SEN platform, Silvergate became "the go-to bank for the cryptocurrency industry," according to its website.

62.     SEN clients could transfer fiat currency from one SEN account to another either via Silvergate's online banking system, or via its proprietary, cloud-based Application Programming Interface, or API.[3] Though money was transferred from one SEN account to another through a traditional intrabank funds transfer enabled through Silvergate's online banking data processing system, the SEN facilitated the transfer by using its API to instantly notify one accountholder when another has sent funds. Because both parties to the transaction were required to be SEN members and Silvergate bank account holders, the API effectively made a notational entry in Silvergate's internal ledger and then notified the parties of that entry. Silvergate thereby acted as a trusted intermediary.

63.     Whether made via Silvergate's online banking system or API, three steps were required to create, authorize, and approve a SEN transfer. First, the sender was authorized as an SEN participant. Second, the receiver was validated as an SEN participant. Third, the transfer amount was confirmed to be available in the originating (sender's) account. SEN transfers were push only and settled virtually instantly if all three conditions were met. No other transfer-of-value type transactions were made on the SEN.

64.     This transfer-and-notify system facilitated transactions involving fiat currency and cryptocurrency. For example, Circle, which owns the USDC stablecoin, was a SEN member, and other SEN members (like FTX) could purchase USDC with fiat instantaneously over the SEN. In a June 2022 interview, Lane explained:

> And so if, if somebody wants to purchase USDC from Circle, what they would do is they
> would send dollars into Circle's bank account at Silvergate, and when those dollars hit the
> bank account, then at that moment there is an API call from Silvergate to Circle that says,
> we just received X amount of dollars from this customer, and at that point Circle knows
> we have the dollars in our possession, so they turn around and they mint the USDC token
> and send it to the wallet address of that institution that is looking to purchase the USDC.

---

[3] An API is a set of definitions and protocols for building and integrating application software that lets a product or service communicate with other products and services without having to know how those other products or services are implemented. Essentially, an API is a communication tool between software applications.

And then the same thing happens in reverse. So, um, if someone wants to redeem their USDC and go back to U.S. dollars, they send the USDC to the wallet at Circle. Circle at that point, once they have possession of the USDC, they then send an instruction to us via API and we then in turn will send a dollar back to that prior USDC token holder.

65.    As Silvergate explained in its Registration Statement, "digital currency exchanges that integrate our API into their technology infrastructure can attribute incoming client funds, at scale, without human involvement and in virtually real-time, typically within a matter of seconds."

66.    FTX was designed to be easy to use even for those who were not experts in cryptocurrency. In one of FTX's television commercials, a professional athlete repeatedly denied that he was an expert in cryptocurrency, while asserting that he did not have to be an expert to use FTX. An exchange that was user-friendly for new users was virtually impossible before the SEN. Before the SEN, a new user may have been required to wire fiat currency to an exchange, where the fiat currency could then be traded for cryptocurrency. To off-ramp back to usable fiat currency—i.e., fiat currency in cash or a bank account—the user then may have needed to trade the cryptocurrency for fiat currency and then receive a wire from the exchange. Given the slowness of traditional wire transfers, these transactions could tie up a user's money for a long time.

67.    With the underlying infrastructure of the SEN, however, FTX users could trade fiat currency for crypto and vice-versa nearly instantaneously and without friction. The SEN was critical for FTX's rapid growth after its launch.

68.    As critical as the SEN was for FTX, FTX was equally critical for the SEN. Digital currency exchanges, such as FTX, were the SEN's largest customers from the beginning, accounting for $729.9 million of the deposits on the SEN, compared to $572.7 million from institutional investors and $227.5 million from other customers. In Figure 2 below, Silvergate's Registration Statement described use of the SEN as of September 30, 2018, as follows:

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:23-cv-00667-JSC

|  | Digital Currency Exchanges | Institutional Investors | Other Customers |
|---|---|---|---|
| Overview | Exchanges through which digital currencies are bought and sold; includes over-the-counter, or OTC, trading desks | Hedge funds, venture capital funds, private equity funds, family offices and traditional asset managers, which are investing in digital currencies as an asset class | Companies developing new protocols, platforms and applications; mining operations; and providers of other services |
| Typical Uses | • SEN to facilitate fiat transfers [1]<br>• API to attribute fiat transfers [2]<br>• Cash management<br>• Deposit accounts to hold investor funds and operating funds | • SEN to transfer fiat to digital currency exchanges and traditional bank accounts [1]<br>• Cash management<br>• Deposit accounts to hold investor funds | • SEN to facilitate fiat transfers [1]<br>• Cash management<br>• Deposit accounts to hold operating funds |
| Noteworthy metrics | Silvergate's customers include the 5 largest U.S. domiciled digital currency exchanges [3] | Silvergate's customers have transferred approximately $9 billion in fiat quarterly since January 1, 2018 [4] | Silvergate's customers have raised over $1 billion through private placements |
| Number of Customers | 35 | 339 | 109 |
| Total Deposits | $792.9 million | $572.7 million | $227.5 million |
| Select Customers |  |  |  |

(1)   SEN transfers are funds transfers within the Bank's deposit system from one SEN participant to another SEN participant.
(2)   This refers to the attribution of funds received by a SEN API user within its own platform on a programmatic basis without manual human interaction, based on the user's integration of the Bank's API into the user's own systems.
(3)   Based on data reflecting U.S. dollar 30 day trading volume as of October 1, 2018 from coinmarketcap.com.

**Figure 2**

### E.    The Growth in Silvergate's SEN Use, Deposits, and Revenue

69.     The SEN grew rapidly after its launch in 2018. From the fourth quarter of 2018 to the fourth quarter of 2019, volume on the SEN increased 150% to 14,400 transactions, representing $9.6 billion. And as shown below, annual SEN transactions grew from $32.7 billion in 2019 to $787.4 billion in 2021, a growth of more than 2,700% in two years. See Figures 3 and 4 below:



**Figure 3**



**Figure 4**

70.     Silvergate's revenue from fees charged for those transactions increased as well, as shown in Figure 5, below.

17



**Figure 5**

71.     According to a securities filing by Silvergate: "The SEN is a central element of the operations of our digital currency related customers, which enables us to grow with our existing customers and to attract new customers who can benefit from our innovative solutions and services." Silvergate's actual growth in digital currency customers from 2017 through its fiscal year 2020 and projected growth to the third quarter of 2021, much of which is attributable to the SEN, is illustrated in Figure 6, below.

**Figure 6**

18

72.     Silvergate's growth in digital currency customers served Lane's goal of growing the bank's deposits. Deposits from Silvergate's cryptocurrency clients were noninterest-bearing, allowing Silvergate to keep all the returns when it invested those deposits.  As Silvergate explained in its Registration Statement, the SEN provided it "a distinctive advantage over most traditional financial institutions" in that it "allows [Silvergate] to generate revenue from a conservative portfolio of investments in cash, short term securities and certain types of loans . . . ."

73.     Silvergate's focus on crypto clients drove "the Bank's funding costs to among the lowest in the U.S. banking industry," which "allowed [Silvergate] to generate attractive returns on lower risk assets through increased investments in interest earning deposits in other banks and securities, as well as funding limited loan growth."

74.     In its Registration Statement, Silvergate illustrated its growth in noninterest-bearing deposits in Figure 7, below:



**Figure 7**

75.     By the end of September 2022, Silvergate's crypto-derived, noninterest bearing deposits were 90% of the bank's overall deposit base, amounting to $11.9 billion. And of that, FTX alone constituted nearly 10% of the $11.9 billion in deposits, or about $1.2 billion. As a result, Silvergate's profits grew even when traffic on the SEN slowed in 2022.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:23-cv-00667-JSC

76.     And because the SEN continually attracted new clients and deposits, Silvergate's overall revenue also grew, resulting in increasingly greater profits as operating costs stabilized, as illustrated in Figure 8, below.



**Figure 8**

77.     Building on the SEN's success, Silvergate subsequently offered SEN Leverage, which Silvergate described as allowing "institutional customers to trade any asset on-platform with leverage collateralized by bitcoin or U.S. dollars," with "near real-time loan disbursements and repayments through" the SEN. Lane admitted that the product was in a regulatory gray area: in a 2021 interview, he said that "[i]t's not like it's an approved product, it's a nondisapproved product, is one of the ways we talk about it in banking circles."

78.     The SEN allowed Silvergate to become the go-to bank for more than a dozen crypto companies that ended up under investigation, shut down, fined, or in bankruptcy, including FTX and Alameda.

**F.     Alameda**

79.     SBF founded Alameda with Gary Wang in October 2017, and it began banking with Silvergate on or about 2018.  Alameda portrayed itself as a quantitative trading firm specializing in cryptocurrency assets. It was headquartered at 2000 Center Street, Suite 400, in Berkeley, California, and was named after Alameda County. SBF owned a 90% stake in Alameda, and Wang a 10% stake. Alameda, relying largely on borrowed money for capital, initially focused mostly on high frequency arbitrage trading through which the company sought to exploit price differences for the same or similar assets across various digital-asset platforms.

80.     Despite being named "Alameda Research," Alameda did not focus on research. The purpose of including the word "Research" in the name was to give the company the appearance of legitimacy, particularly with respect to banks. On a podcast in 2021, before the collapse of FTX, SBF explained:

> Especially in 2017, if you named your company like We Do Cryptocurrency Bitcoin Arbitrage Multinational Stuff, no one's going to give you a bank account . . . . [T]hey're just going to be like, yeah, no, we've been warned about companies with this name. You know, you're going to have to go through the enhanced process. And I don't want to bother with that right now; it's almost lunchtime.

81.     When Alameda eventually opened bank accounts, banks immediately began questioning Alameda's transactions. Alameda's international cryptocurrency arbitrage involved transferring money between Japanese accounts denominated in yen and American accounts denominated in U.S. dollars, typically via wire transfer. In the same podcast, SBF described the attention that these transfers drew from banks:

> And finally sent the wire, and they're like, wait, you sent this yesterday. This is a mistake. Like, no, no, no. We're sending again. Like, no, no, no. You sent this exact one yesterday. Like, yeah, that's right. We're sending it again. And now they're like, wait, you're telling me that two days in a row, you're sending an international wire transfer across currency, across continent, in the same direction for the same size with no transfer

coming the other way. That's sketchy as s***, right? Where is your money coming from? And we're like, well, it's fake internet money. And they're like, oh, that makes us feel better.

82.     Although by SBF's own description, banks had "been warned about" companies doing cryptocurrency transactions, and Alameda had been doing "sketchy as s***" wire transfers involving "fake internet money," in 2018, Silvergate opened an account for Alameda and continued to accept Alameda deposits and process Alameda transactions until it collapsed in November 2022.

83.     In early 2018, Alameda expanded its business to involve new other strategies in addition to arbitrage, such as market making, staking (pooling cryptocurrency assets in exchange for interest), volatility trading, and eventually taking large equity stakes in various digital-asset companies. Alameda also offered over-the-counter trading services and made and managed other debt and equity investments.

84.     At first, SBF was responsible for trading operations, and Wang handled the engineering and programming functions. Nishad Singh joined in December 2017, and Wang and Singh became the lead engineers. Over time, Alameda hired additional employees, including Caroline Ellison (in or around March 2018) and Sam Trabucco (in or around 2019). By the end of 2021, Alameda had approximately 30 employees. Collectively, SBF, Wang, Ellison, and Singh are hereafter referred as the "Insiders."

85.     Alameda's leadership was young and lacked business experience. The Insiders were in their mid-20s when they began working for Alameda, and each had at most a few years of work experience. Before joining Alameda, SBF and Ellison had worked at the proprietary trading firm Jane Street, and Wang and Singh for Google Flights and Facebook, respectively, none for more than about three years. Nonetheless, Alameda claimed within a year of its founding that it had "become the largest liquidity provider and market maker in the [digital] asset space," and traded "$600 million to 1 billion a day" which it said was "roughly 5% of global volume in digital asset trading."

86.     Another co-founder of Alameda, Tara Mac Auley, left the firm within about six months of its founding. After FTX's collapse, on November 16, 2022, she tweeted: "Quick facts: I started

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:23-cv-00667-JSC

Alameda with Sam in 2017. In April 2018, I and a group of others all quit, in part due to concerns over risk management and business ethics." *Time* later reported that Mac Auley and others confronted SBF in April 2018 and demanded his resignation due to their concerns, and when SBF refused to step down, four members of the management team, including Mac Auley, and roughly half of Alameda's 30 employees resigned.

87.     These concerns about risk management were prompted by troubling developments at Alameda. After the collapse, *The Wall Street Journal* reported that by the spring of 2018, Alameda's assets had declined by more than two-thirds, to about $30 million, partly due to a big loss on XRP, the token used on the Ripple payment network. In response, SBF sought even more loans to keep Alameda afloat, promising returns as high as 20%.

88.     SBF operated as the majority owner of Alameda at all relevant times, and was the CEO of Alameda until fall 2021, when Ellison and Trabucco became co-CEOs. Even after that, SBF continued to control Alameda, remaining a signatory on its bank accounts and maintaining decision-making authority over all of its trading, investment, and financial decisions.

**G.     The FTX Exchange**

89.     In 2018, SBF began building a crypto asset trading platform, which would eventually become FTX. Singh joined the effort to create FTX in or around April 2019. Singh worked on the foundational code for FTX with Wang, who became Chief Technology Officer. FTX began operations in May 2019.

90.     FTX began as an exchange or marketplace for the trading of cryptocurrency assets. Until filing for bankruptcy on November 11, 2022 (the same day Alameda did), FTX and its affiliates operated a multi-billion-dollar mobile application cryptocurrency investment service that offered trading in various options, futures, swaps, and other digital commodity derivative products. FTX also offered various services related to cryptocurrency trading. For example:

- Maintaining a spot market on which FTX customers could trade cryptocurrency with other FTX customers in exchange for money or other cryptocurrency;

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:23-cv-00667-JSC

- Maintaining spot-margin trading services, which enabled FTX customers to borrow against collateral in their FTX accounts and trade or lend cryptocurrency in their accounts to other FTX customers for purposes of executing trades;

- Maintaining an over-the-counter service that allowed investors to request quotes for spot cryptocurrency assets and carry out trades; and

- Serving as a platform for the purchase and sale of crypto futures contracts.

91.     Customers were able to access the FTX platform through the FTX website, FTX.com, as well as through its popular mobile app. FTX claimed it was building a digital-asset trading platform and exchange to promote a better user experience, customer protection, and innovative financial products.

92.     FTX's Terms of Service provided that "the Platform may support various fiat currencies for deposit, withdrawal, and/or trading, using wire transfers, credit cards, or other appropriate methods," and "[o]nce we receive fiat currency that you load into your Account, we may issue you with an equivalent amount of electronic money ('E-Money'), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded. This amount will be displayed in your Account." However, this "E-MONEY IS NOT LEGAL TENDER." Nevertheless, "You may redeem all or part of any E-Money held in your Account at any time . . . . Unless agreed otherwise, funds will be transferred to the bank account you have registered with us."

93.     Signing up for FTX was simple. FTX did not require its users to validate their identities by providing official identification documents. In fact, as shown in Figure 9, a screenshot of FTX's website in or around late 2019, to sign up, an FTX user was not required to provide even the most basic identifying information, such as name, date of birth, address, or other identifiers.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:23-cv-00667-JSC



**Figure 9**

94.     As a result, users were able to create and fund FTX accounts with nothing more than an email address. This meant accounts on FTX could easily be opened anonymously.

95.     In 2019, in an effort to avoid United States regulatory requirements, including the requirements of the United States securities laws, SBF and Wang moved to Hong Kong. Ellison joined them in Hong Kong in November 2019, and Singh moved to Hong Kong in 2020. In November 2021, both FTX and Alameda relocated to The Bahamas.

96.     The decision to move offshore exacerbated the risks to Silvergate of banking FTX and Alameda. The companies were now operated and headquartered in lightly-regulated, offshore jurisdictions, explicitly to avoid U.S. regulatory requirements and oversight.

97.     Nonetheless, Silvergate banked both FTX and Alameda. FTX and Alameda were among Silvergate's most important customers, and their business operations and interests were tightly entwined. Silvergate profited from dollar deposits by digital-asset customers, and these deposits grew exponentially as FTX's own business expanded. Out of Silvergate's approximately 1,500 customers,

FTX alone accounted for almost 10% of Silvergate's deposits, easily surpassing the materiality threshold for reporting purposes under the federal securities laws.

98.     Silvergate had a strong incentive to continue accepting FTX and Alameda customer deposits, executing transfers, and taking other actions in furtherance of the FTX/Alameda scheme. Silvergate's core business centered around customer adoption of the FTX exchange platform and app. Silvergate earned income from transaction fees as well as earning interest on money deposited in FTX accounts at Silvergate.

99.     Silvergate held its initial public offering on November 7, 2019. Before it went public in 2019, and before it obtained FTX as a client, Silvergate had an annual net income of $7.6 million. By 2021 its net annual income had increased to $75.5 million.

100.    In multiple public statements, SBF held himself out as a visionary leader in the crypto industry and touted his efforts to create a regulated and thriving crypto asset market. He conducted an intensive public relations campaign to brand himself and his companies as honest stewards of crypto.

101.    SBF and those speaking at his direction and on his behalf continuously highlighted to the public the purported safety of the platform and its products. FTX touted automated risk mitigation procedures, including a program that calculated a customer's margin level every 30 seconds and automatically liquidated assets if collateral fell below a certain threshold. SBF stated repeatedly that FTX and its customers were protected from others' losses due to this auto-liquidation program.

102.    SBF made repeated public statements assuring investors that their FTX assets were safe, tweeting, for example: "Backstopping customer assets should always be primary. Everything else is secondary"; and "[a]s always, our users' funds and safety comes first. We will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)."

103.    SBF represented that FTX offered "complete transparency about the positions that are held [and] a robust, consistent, risk framework." And he touted FTX's technical expertise and its proprietary, automated, internal "risk engine," which was designed and created to keep its customers safe.

104.     Similarly, FTX's Terms of Service assured investors they owned and controlled assets placed on the exchange. Those terms stated unequivocally that "[t]itle to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading." The terms further provided that "[n]one of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading" and that "You control the Digital Assets held in your account. At any time, subject to outages, downtime, and other applicable policies . . . you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."

105.     FTX and its operating entities, FTX Digital Markets, Ltd. (FTX DM) and FTX US, thus had fiduciary duties to FTX's customers, including pursuant to FTX's Terms of Service and FTX US's User Agreement, to ensure that the customers' funds were segregated and held in trust for the customer. Customer funds were not considered the property of FTX or FTX DM.

106.     FTX also solicited investments that were purportedly loans to be used on the FTX.com exchange to purchase crypto assets that would generate promised returns. Investors purchased FTT tokens (FTX's proprietary token) on the understanding that FTX, using part of its profits, would buy back the tokens at various times. FTT was used on FTX to secure loans, trade digital assets, stake (lock crypto assets for a set period) for rewards, and reduce trading fees on the platform.

107.     FTT tokens and other FTX digital assets were not registered with any U.S. jurisdiction or regulatory authority. As shown in Figure 10, unconstrained by U.S. securities law, FTX marketed vaguely described crypto investments as delivering "HIGH RETURNS WITH NO RISK":

## Investment offerings

**PACKAGES**

We offer one investment product:

> **15% annualized fixed rate loans** (no lockup)

We can accept both fiat and crypto and can pay interest denominated in either. We can take on another $200m in capital and still achieve returns that beat traditional and crypto markets.

For investors with specific risk profiles, we are happy to discuss custom packages. For investments of $50m or more, we are willing to discuss higher rates of return.

**HIGH RETURNS WITH NO RISK**

These loans have **no downside** – we guarantee full payment the principal and interest, enforceable under US law and established by all parties' legal counsel. We are extremely confident we will be pay this amount. In the unlikely case where we lose more than 2% over a month we will give all investors the opportunity to recall their funds and we will still guarantee full repayment.

**Figure 10**

### H.     Alameda Misappropriates FTX Investor Funds

#### 1.     FTX and Alameda executives falsely represented to the public that FTX and Alameda were run separately and appropriately.

108.     To assuage public concerns about potential conflicts of interest between FTX and Alameda, the Insiders understood that it was important to create a public perception that there was strong separation between Alameda and FTX. SBF and others reinforced a separate-spheres narrative in their public statements.

109.     SBF, individually and through his agents and employees, made a point of publicly maintaining that there were "circuit breakers" in place to ensure the separation of Alameda and FTX, and to ensure Alameda did not receive preferential treatment on the FTX platform.

110.     In public venues such as Twitter and when providing information to the U.S. Congress, the CFTC, other federal and state government agencies, and investors, representatives of FTX consistently and repeatedly reiterated, in a variety of contexts, that customer assets were properly segregated and custodied by FTX at all times.

111.     SBF's public statements regarding this purported FTX/Alameda separation included:

- To *The Wall Street Journal*: "There are no parties that have privileged access";
- To *Bloomberg*: "Alameda is a wholly separate entity" and "We're at arm's length and don't get any different treatment from other market-makers."

112.   In like vein, during an August 2022 media appearance, Alameda's CEO Ellison described a purported firewall between FTX and Alameda:

> They're both owned by Sam, obviously. So ultimately, sort of aligned incentives in that way. We keep them quite separate in terms of day-to-day operations. We definitely have a Chinese wall in terms of information sharing to ensure that no one in Alameda would get customer information from FTX or anything like that, or any sort of special treatment from FTX. They really take that pretty seriously.

113.   Even after the FTX bankruptcy, SBF claimed to *The New York Times* that "Alameda is not, like, a company that I monitor day-to-day." He similarly claimed to *New York Magazine* that Alameda is "not a company I run. It's not a company I have run for the last couple years."

114.   In truth, however, SBF ran FTX and Alameda as a personal fiefdom. The FTX entities, with minor exceptions, lacked independent or experienced finance, accounting, human resources, information security, or cybersecurity personnel or leadership, and lacked any internal audit function whatsoever. Board oversight was effectively non-existent. Most major decision-making and authority sat with the Insiders, and numerous significant responsibilities were not delegated to other executives or managers even where such individuals had been hired. Echoing their lack of appropriate management and governance structure, the FTX entities lacked an appropriate organizational structure. Rather than having an ultimate parent company able to serve as a central point for decision-making that could also direct and control its subsidiaries, the FTX entities were organized as a web of parallel corporate chains with various owners and interests, all under the ultimate control of SBF.

115.   The FTX entities did not have personnel who were experienced and knowledgeable enough to account accurately for assets and liabilities, understand and hedge against risk, or compile and validate financial reports. Key executive functions, including those of Chief Financial Officer, Chief Risk Officer, Global Controller and Chief Internal Auditor, were missing at some or all critical

entities. The FTX entities had no dedicated financial risk, audit, or treasury departments. Although certain of the FTX entities nominally employed individuals responsible for accounting at those entities, in many instances, those individuals lacked the requisite expertise and had little or no internal staff. As a general matter, policies and procedures relating to accounting, financial reporting, treasury management, and risk management did not exist, were incomplete, or were highly generic and not appropriate for a firm purporting to act as a fiduciary for third parties.

116.    Other, non-Silvergate financial institutions commented on the absence of risk management at FTX. *The Wall Street Journal* reported after the collapse:

> In 2020, Citigroup Inc. was exploring partnerships with Alameda and others to launch a crypto lending business. Austin Campbell, then the bank's co-head of digital assets rates trading, said he grew skeptical of the firm after getting vague answers to his questions.
>
> "The thing that I picked up on immediately that was causing us heartburn was the complete lack of a risk-management framework that they could articulate in any meaningful way," he said.

117.    FTX and Alameda disregarded substantially all pertinent corporate formalities. For example, an independent CEO for FTX reported after declaring bankruptcy:

> Although the FTX Group consisted of many, separate entities, transfers of funds among those entities were not properly documented . . . . Expenses and invoices of the FTX Group were submitted on Slack and were approved by "emoji." These informal, ephemeral messaging systems were used to procure approvals for transfers in the tens of millions of dollars, leaving only informal records of such transfers, or no records at all.
>
> . . .
>
> The FTX Group did not observe any discernable corporate formalities when it came to intercompany transactions. Assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or documentation. Alameda routinely provided funding for corporate expenditures (e.g., paying salaries and other business

expenses) whether for Alameda, for various other Debtors, or for FTX DM, and for venture investments or acquisitions whether for Alameda or for various other Debtors. Alameda also transferred funds to insiders to fund personal investments, political contributions, and other expenditures—some of which were nominally "papered" as personal loans with below-market interest rates and a balloon payment due years in the future.

118.   FTX and Alameda also shared office space, first in Berkeley, California, and later in Hong Kong and The Bahamas, as well as key personnel, hardware, technology, and intellectual property. The Insiders and other employees of each company lived together in a luxury penthouse apartment in The Bahamas.

119.   In addition, SBF and other senior executives at FTX and Alameda had widespread access to each other's systems and accounts.

120.   From its inception, FTX had poor controls and fundamentally deficient risk management procedures. Assets and liabilities of all forms were generally treated as interchangeable, and there were insufficient distinctions between the assignment of debts and credits to Alameda, FTX, and the Insiders. This reality was a sharp contrast to the image of FTX that SBF consistently portrayed to the public and to investors—a mature company that managed funds and risk in a conservative, rigorous manner.

121.   Perhaps the most significant failure of corporate controls involved the use of FTX customer funds. The SEC later alleged, and Alameda and FTX executives later admitted that "[f]rom the inception of FTX, Defendants and SBF diverted FTX customer funds to Alameda, and continued to do so until FTX's collapse in November 2022."

122.   FTX diverted customer funds to Alameda in at least two ways: (1) by directing FTX customers to deposit fiat currency (*e.g.*, U.S. dollars) into bank accounts controlled by Alameda, often Silvergate accounts; and (2) by enabling Alameda to draw on a virtually limitless "line of credit" at FTX, which was funded by FTX customer assets. Silvergate banked both FTX and Alameda, and it processed transfers that sent FTX customer money to Alameda.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:23-cv-00667-JSC

### 2.   The fiat@ftx.com account

123.   When FTX launched, it did not have the requisite bank accounts to accept and hold customer funds, in part because cryptocurrency exchanges are subject to more stringent due diligence requirements than are other industry participants. As a result, and at SBF and FTX's direction, from the start of FTX's operations in around May 2019 and continuing into 2022, FTX customers wired or otherwise deposited billions of dollars in fiat currency into bank accounts that were controlled by Alameda.

124.   To facilitate the misappropriation of FTX funds into Alameda accounts, on December 17, 2019, SBF formed and registered Alameda Research Ltd., as a British Virgin Islands (BVI) limited corporation, with a corporate address in Tortola, BVI ("Alameda Ltd."). Shortly thereafter, Alameda Ltd. opened at least three bank accounts with Silvergate Bank (ending in #4456, #4464, and #4605).

125.   Although Alameda Ltd. was a BVI company purportedly headquartered in Tortola, it operated as an alter ego of Alameda and FTX, and was operated by the same persons, including SBF, out of Alameda's offices in Berkeley, California.

126.   At least some of the bank accounts that received wires from FTX customers were not in Alameda's name, but rather in the two accounts (ending in #8738 and #8746) at Silvergate in the name of North Dimension Inc. ("North Dimension"), a shell company owned by Alameda. Far from disguising the fraudulent conduct, however, North Dimension's activities exhibited many red flags that North Dimension was part of an unlawful scheme. North Dimension was fully owned by Alameda and operated from the same address, but North Dimension had no legitimate business of its own. It had a website that purported to sell electronics, but the website was full of misspellings and illogical prices, such as sale prices hundreds of dollars above the regular prices. Clicking on an item did not initiate a purchase; it generated a pop-up saying: "Feel free to send a message. We collaborate with ambitious brands and people; we'd love to build something great together."

127.   Moreover, the pattern of North Dimension's wire transfers—which Silvergate processed—was highly irregular. FTX customers wired money to North Dimension, but Alameda did not segregate these customer funds or transfer them to FTX. Instead, it commingled them with its other

assets and used them indiscriminately to fund its trading operations and Bankman-Fried's other ventures. The use of a fake business to misdirect money from one company to a separate, co-owned company is a clear red flag of money laundering and fraudulent conduct.

128.   Once received, FTX customer assets were not segregated from Alameda assets or placed into accounts designated as "for the benefit of" (FBO) FTX customers. Initially, when FTX customer assets were deposited into Alameda bank accounts, Alameda personnel manually credited FTX customer accounts with E-money corresponding amount to the amount of fiat currency on FTX's internal ledger system. Customers accessing their FTX accounts would be able to observe on the exchange's website (and later mobile application) that their deposits had been posted to their FTX accounts, even though the fiat deposits actually remained in Alameda-controlled bank accounts.

129.   The Alameda-owned bank accounts holding FTX customer money were collectively reflected on FTX's internal ledger systems as the "fiat@ftx.com" account. This account held a liability of as much as $8 billion in FTX customer assets. To the extent it needed money, Alameda used the funds for its own purposes rather than maintaining them as bank deposits or converting them to stablecoins in FTX-controlled wallets.

130.   Even after FTX opened its own FBO bank accounts, previously-transferred FTX customer assets were not moved into FTX's bank accounts and instead continued to be reflected in the "fiat@ftx.com" account. In addition, FTX customers continued to send their money to Alameda-owned accounts.

131.   SBF invented special rules to allow the diversion of FTX-bound money to Alameda, intentionally allowing it to loot FTX at will:

- Alameda was exempted from FTX's auto-liquidation feature, meaning it was permitted to maintain a negative balance in its account with no collateral. It was the only account afforded that treatment.

- SBF directed FTX to increase Alameda's negative balance cap, effectively providing it with an uncapped line of credit, through which it could use other FTX customer funds for its own trading activities. No other FTX account was granted a similar line of credit.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:23-cv-00667-JSC

### 3. Alameda and FTX executives misappropriated FTX customer funds.

132. After Alameda misappropriated FTX customer funds, Alameda used the funds to: (1) subsidize Alameda and FTX's money-losing operations, (2) speculate in cryptocurrencies and related enterprises, (3) make political donations, (4) purchase real estate, (5) pay outside lenders, and (6) support lavish lifestyles, and (6) engage in other unauthorized uses.

133. Several of the Insiders have admitted that "[t]he use of customer assets by Alameda was not authorized by FTX customers, and FTX customers were not made aware that their assets were being used by Alameda. To the contrary, FTX's Terms of Service expressly prohibited such use of customer assets."

### I. Alameda and FTX Commit More Deeply to the Scheme

134. The scale of the misappropriation of FTX customer funds grew over time. One of the key moments came after the collapse of an unrelated crypto business in May 2022, which led to sharp declines across various major cryptocurrencies. Several major crypto companies, including Voyager, Celsius, and Three Arrows Capital, collapsed. The value of Bitcoin, which was already beginning to decline, plummeted.

135. Alameda was heavily invested across the crypto market and suffered significant losses during this period. These losses posed a problem because of Alameda's unusual capital structure: unlike a traditional hedge fund, which pays its investors only if the fund's investments prove profitable, Alameda funded its operations with borrowed money.

136. By 2021, Alameda had borrowed billions of dollars from third-party crypto asset lending firms in order to fund SBF's venture investments and for his personal use. Alameda's creditors began to demand repayment.

137. Because Alameda did not have sufficient assets to cover all of these obligations, SBF directed Ellison to draw on Alameda's "line of credit" from FTX, which, based on the software code that Wang had previously created, allowed Alameda to "borrow" at will from FTX. Billions of dollars of FTX customer funds were thus intentionally diverted to Alameda and used by Alameda to re-pay its third-party loan obligations.

138.     By approximately mid-2022, FTX's internal ledgers reflected that Alameda's liability to FTX totaled approximately $8 billion, exceeding FTX's total lifetime revenue. Singh then reallocated Alameda's approximately $8 billion in liabilities to a customer account on FTX's systems that SBF would later refer to as "our Korean friend's account" or "the weird Korean account." SBF and others were aware of this transfer at the time it occurred. The system notes associated with the account described it as "FTX fiat old." The same method of allowing a negative balance and exemption from liquidation characteristics was carried over to the so-called Korean account.

139.     In approximately mid-2022, Singh undertook a project to segregate, account for and reconcile the "moral balances" between commingled FTX assets—including customer assets in the "fiat@ftx.com" account—and Alameda's own assets. After several months of effort, this project failed, due in part to a lack of adequate documentation of the sources of funds contained in various accounts. The failure of the project exemplified the depth of the practically irreconcilable commingling of FTX customer assets with FTX and Alameda's own assets.

140.     Despite the extreme and mounting problems within Alameda and the cryptocurrency space generally, Alameda diverted $1.4 billion into crypto startups in 2021, according to *The Wall Street Journal* based on review of an internal company document. By and large, these investments were not profitable in 2021 or 2022, leading Alameda to misappropriate more FTX customer funds.

**J.     The FTX Scheme Collapses**

141.     FTX's swift collapse was set in motion on November 2, 2022, when adverse reports about FTX's balance sheet led customers to withdraw an estimated $6 billion from FTX over the course of 72 hours.

142.     On November 8, 2022, FTX paused all customer withdrawals. At the same time, since Alameda's speculative investments had been going bad for months, Alameda was unable to repay the loans. FTX's loans to Alameda were unrecoverable.

143.     On the morning of November 9, at approximately 10 AM ET, Ellison held an "all-hands" meeting with Alameda staff.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:23-cv-00667-JSC

144.     In that meeting, Ellison acknowledged that earlier that year, she, SBF and other individuals had decided to use FTX customer assets to pay Alameda's debts, and that Wang and another FTX executive were aware of this.

145.     Specifically, in that meeting, Ellison stated that, "starting last year" Alameda was "borrowing a bunch of money by open term loans" and used those assets to "make very illiquid investments." Ellison further explained that following the widespread decline of digital asset prices, most of Alameda's loans had been recalled and, in order to meet those recalls, Alameda borrowed "a bunch of funds" from FTX, which in turn "led to FTX having a shortfall in user funds."

146.     Ellison informed Alameda staff that FTX had "always allowed" Alameda to borrow customer assets and did not require collateral for those loans. She also explained that Alameda could access user assets without requiring FTX's approval as the "structure" allowed Alameda to "go negative in coins."

147.     On November 10, 2022, the Securities Commission of The Bahamas froze the assets of FTX Digital Markets, a Bahamian subsidiary of FTX. FTX halted all trading and withdrawals.

148.     On the same day, in the midst of FTX's collapse, SBF admitted to culpability in a series of Twitter exchanges with reporters and investors:



150.     On November 11, 2022, FTX filed for Chapter 11 bankruptcy and SBF resigned as CEO. The bankruptcy filing includes over 130 companies under the FTX umbrella, as well as the trading firm Alameda.

151.     Following the collapse, SBF was asked how FTX customer deposits ended up in Alameda's accounts. Bankman responded that his exchange platform did not originally have a bank

account, so customers were directed to wire money to *Alameda's* account with Silvergate in exchange for the commodity assets on FTX.

152.    According to SBF, executives at FTX "forgot" about this irregular depositing arrangement right up until the company imploded: he wrote in an interview shortly after the bankruptcy that "it looks like people wired $8b to Alameda and oh god we basically forgot about the stub account that corresponded to that and so it was never delivered to FTX."

153.    In another interview after the collapse, SBF sought to downplay his conduct as an error or oversight:

> There was a F*** up, I was incorrect on Alameda's balances on FTX by a fairly large number, an embarrassingly large one and it was because of a, like, very poorly labeled accounting thing, which was a historical artifact of a time before FTX had bank accounts and the result of that was basically there was a time back yonder when people would wire money to Alameda and then actually credited on FTX. This . . . got screwed up and that was like a pretty big miss and that meant Alameda was substantially more levered than I thought it was.

154.    These explanations were false. SBF and the other Insiders knew full well that they were misappropriating FTX customer funds from the inception of FTX.

155.    John J. Ray ("Ray"), who oversaw Enron following its accounting scandal, became CEO. After reviewing FTX's books and records, Ray declared that "never in my career have I seen such an utter failure of corporate controls at every level of an organization, from the lack of financial statements to a complete failure of any internal controls or governance whatsoever."

156.    Ray stated that FTX "failed to implement virtually any of the systems or controls that are necessary for a company that is entrusted with other people's money" and that the "[c]ash management procedural failures included the absence of an accurate list of bank accounts and account signatories, as well as insufficient attention to the creditworthiness of banking partners around the world." Ray noted "[t]he ability of Alameda, the crypto hedge fund within the FTX Group, to borrow funds held at FTX.com to be utilized for its own trading or investments without any effective limits."

157.    Further, Ray stated "we know" that "customer assets from FTX.com were commingled with assets from the Alameda trading platform," that Alameda "used client funds to engage in margin trading which exposed customer funds to massive losses," and that "loans and other payments were made to insiders in excess of $1 billion."

158.    According to a presentation released as part of the bankruptcy case on March 2, 2023, $8.9 billion of FTX customer funds remain missing.

159.    As went FTX, so went Silvergate. Silvergate prospered for years as the FTX fraud gathered momentum. After closing at $12.50 per share on the day of its IPO, the price of Silvergate stock increased to $219.75 per share as of November 15, 2021. As a major Silvergate shareholder, Lane prospered. But by December 9, 2022, following FTX's collapse, Silvergate shares had dropped back down to $21.43.

160.    Similarly, at the end of the third quarter of 2022, Silvergate had $11.9 billion in crypto-related deposits. After the FTX collapse, at the end of the following quarter, Silvergate had only $3.8 billion, a 68% drop.

161.    On March 3, 2023, Silvergate discontinued the SEN. On March 8, 2023, Silvergate announced that it intended to wind down operations and voluntarily liquidate Silvergate Bank. On March 31, 2023, Silvergate closed all non-CD Silvergate accounts.

**K.    Silvergate's Complicity in the FTX Scheme**

**1.    Defendants' Knowledge of the FTX Fraud**

162.    As described above, by virtue of its status as a bank and money transmitter, Silvergate was required to develop, implement, and maintain an effective AML program. According to Silvergate's public filings with the Securities and Exchange Commission, the company "invested heavily in [its] risk management and compliance infrastructure," and "attracted a talented, dedicated compliance team with substantial experience in regulated financial institutions, including developing, implementing and monitoring systems to detect and prevent financial crimes." This team "developed a strong risk management and compliance framework that leverages technology for onboarding and monitoring market participants." These "proprietary compliance procedures, developed over five years

of serving the digital currency industry," were "designed to enable [Silvergate] to prudently and efficiently establish deposit accounts for market participants."

163.   According to Silvergate, its "onboarding process . . . includes extensive regulatory compliance diligence," and Silvergate claims it is "highly selective in [its] customer onboarding process to ensure the integrity of the [SEN] platform."

164.   More specifically, Silvergate "comprehensively investigates the customers it proposes to onboard according to the level it deems necessary and appropriate, based on whether the customer is an 'administrator,' an 'exchanger' or a 'user' of virtual currencies" as "defined in March 2013 guidance by the U.S. Treasury Department . . . ."

165.   According to Silvergate, "at a minimum," its "due diligence and onboarding processes include . . . detailed reviews of each customer's ownership, management team, business activities and geographies in which they operate."

166.   Moreover, "[f]or customers such as exchanges which pose a higher degree of risk or have a higher degree of regulatory obligations, [Silvergate's] processes are more extensive and incorporate reputational reviews, reviews of applicable licensing requirements, plans, and status, and reviews of customer policies and procedures regarding BSA, consumer compliance, information security, Dodd-Frank Act prohibitions against unfair, deceptive or abusive acts or practices, as well as reviews of transaction monitoring systems and audit results."

167.   Lane acknowledged Silvergate's duties, stating that "[f]or each and every account, these laws require us to determine the beneficial owner, the source of funds, and the purpose and expected use of funds. Silvergate also monitors transaction activity for every account and identifies activity outside of the expected usage."

168.   Lane claimed in a December 5, 2022 "Public Letter from Silvergate Capital Corporation Chief Executive Officer Alan Lane" that:

> For each and every account, [applicable] laws require us to determine the beneficial owner, the source of funds, and the purpose and expected use of funds.

Silvergate also monitors transaction activity for every account and identifies activity outside of the expected usage. . . .

This is no small undertaking. We have invested, and will continue to invest, in systems and procedures to help ensure we are conducting effective customer due diligence and monitoring. We have dedicated a substantial number of Silvergate employees to this effort. And, as our customers can attest, the onboarding process can take weeks as a result of the time we spend gathering and reviewing information and documentation from prospective customers. After accounts are open, we continue to monitor account activity as part of our enhanced due diligence process on each of these accounts . . . .

. . .

Silvergate conducted significant due diligence on FTX and its related entities including Alameda Research, both during the onboarding process and through ongoing monitoring, in accordance with our risk management policies and procedures and the requirements outlined above.

169.    Similarly, on December 19, 2022, Mr. Lane affirmed that "Silvergate has instituted and consistently updates and improves, a robust compliance and risk management program that spans the life cycle of each client." Mr. Lane, moreover, confirmed that "we determine the beneficial owner, the source of funds, and the purpose and expected use of funds for each and every account we open." He also confirmed that the bank "monitors transaction activity for every account and identifies activity outside of the expected usage."

170.    Numerous accounts held by SBF's companies—including FTX Ventures Ltd., FTX US, Alameda, and North Dimension—were held at Silvergate Bank, including:

a.   At least eight accounts for Alameda and related entities, as shown below;

| Debtor | Bank Name | Last Four Digits of Account No. |
|---|---|---|
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 7502 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 3065 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0109 |
| FTX Japan K.K. | SBI Sumishin Net Bank Ltd. | 0110 |
| Alameda Research LLC | Signature Bank | 5489 |
| Alameda Research Ltd | Signature Bank | 9485 |
| Maclaurin Investments Ltd. | Signature Bank | 2685 |
| Blockfolio, Inc. | Signature Bank | 4174 |
| FTX Europe AG | Signature Bank | 7500 |
| FTX Trading Ltd | Signature Bank | 9964 |
| FTX Trading Ltd | Signature Bank | 9018 |
| FTX Ventures Ltd | Signature Bank | 7872 |
| Hive Empire Trading Pty Ltd | Signature Bank | 3087 |
| Ledger Holdings Inc. | Signature Bank | 8106 |
| Ledger Prime LLC | Signature Bank | 5385 |
| Ledger Prime LLC | Signature Bank | 5377 |
| Paper Bird Inc | Signature Bank | 8701 |
| West Realm Shires Inc. | Signature Bank | 7436 |
| West Realm Shires Services Inc. | Signature Bank | 2804 |
| West Realm Shires Services Inc. | Signature Bank | 3976 |
| West Realm Shires Services Inc. | Signature Bank | 6989 |
| West Realm Shires Services Inc. | Signature Bank | 6989 |
| FTX Lend Inc. | Signature Bank | 7651 |
| Crypto Bahamas LLC | Signature Bank | 5171 |
| Good Luck Games, LLC | Signature Bank | 7432 |
| Goodman Investments Ltd. | Signature Bank | 2903 |
| West Realm Shires Financial Services Inc. | Signature Bank | 9812 |
| Alameda Research LLC | Signet | 5489 |
| Ledger Holdings Inc. | Silicon Valley Bank | 7808 |
| Alameda Research KK | Silvergate Bank | 3433 |
| Alameda Research KK | Silvergate Bank | 4621 |
| Alameda Research LLC | Silvergate Bank | 5587 |
| Alameda Research LLC | Silvergate Bank | 6056 |
| Alameda Research LLC | Silvergate Bank | 6080 |
| Alameda Research Ltd | Silvergate Bank | 4456 |
| Alameda Research Ltd | Silvergate Bank | 4464 |
| Alameda Research Ltd | Silvergate Bank | 4605 |
| FTX Europe AG | Silvergate Bank | 4439 |

**Figure 12**

b.   At least two accounts for North Dimension, as shown below;

| | | |
|---|---|---|
| Ledger Prime LLC | Silvergate Bank | 1223 |
| Ledger Prime LLC | Silvergate Bank | 3145 |
| North Dimension Inc | Silvergate Bank | 8738 |
| North Dimension Inc | Silvergate Bank | 8746 |
| West Realm Shires Services Inc. | Silvergate Bank | 8589 |

c.   At least one account for FTX Ventures, Ltd. ("FTX Ventures"), as shown below; and

| Debtor | Bank Name | Last Four Digits of Account No. |
|---|---|---|
| West Realm Shires Services Inc. | Silvergate Bank | 1239 |
| West Realm Shires Services Inc. | Silvergate Bank | 8597 |
| West Realm Shires Services Inc. | Silvergate Bank | 8605 |
| FTX Ventures Ltd | Silvergate Bank | 3181 |
| FTX TURKEY TEKNOLOJİ VE TİCARET | Siraat Banksai | 5007 |

**Figure 13**

d.   At least four accounts for FTX Digital Markets with the below account numbers.

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:23-cv-00667-JSC

- 0000005090042549
- 0000005090042556
- 0000005090042564
- 0000005091010037

171.    As part of its onboarding due diligence, including through documents such as a Business Account Application, a Certificate of Beneficial Ownership, and a Fund Risk Review Questionnaire, Silvergate obtained or determined relevant information related to each Alameda- or FTX-related entity. This included, among other things, information such as: its beneficial owners, corporate formalities and organization including related entities, locations, licenses and registrations, and number of employees; the nature of its business as it relates to cryptocurrency; assets under management; the anticipated amount and size of transactions within the account (i.e., volume on a monthly basis) and source of funds therefore; and personal information about the business's principals.

172.    As alleged above, the FFIEC Manual directs banks to watch for "red flags" indicating possible money laundering or other misconduct. The activity in the FTX/Alameda accounts at Silvergate featured all of the following red flags:

- "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

- "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

- "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

- "Frequent involvement of multiple jurisdictions or beneficiaries located in higher-risk offshore financial centers."

- "Funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations."

- "A foreign correspondent bank exceeds the expected volume in its client profile for funds transfers, or an individual company exhibits a high volume and pattern of funds transfers that is inconsistent with its normal business activity."

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:23-cv-00667-JSC

- "A business is reluctant, when establishing a new account, to provide complete information about the nature and purpose of its business, anticipated account activity, prior banking relationships, the names of its officers and directors, or information on its business location."

- "A customer is a trust, shell company, or Private Investment Company that is reluctant to provide information on controlling parties and underlying beneficiaries."

- "Purpose of the shell company is unknown or unclear."

- "Payments or receipts with no apparent links to legitimate contracts, goods, or services are received."

173. FTX and Alameda's operations and transactions presented additional red flags.

174. A bank like Silvergate ordinarily must ask for and analyze Alameda's and FTX's financial statements as part of routine due diligence. Silvergate and Lane thus knew that Alameda never retained an outside auditor or generated any semblance of audited financial statements.

175. Routine due diligence also ordinarily includes requesting a list of each Alameda and FTX entity's board of directors and a list of the date of every board meeting, as well as board minutes. Silvergate and Lane thus knew that Alameda and FTX did not observe ordinary corporate formalities, such as having a Board of Directors that conducted meaningful oversight.

176. Silvergate and Lane knew that FTX accepted several billion dollars from FTX customers for use in trading on the FTX exchange, which was deposited not in an FTX account but in an account in the name of or associated with Alameda through a pattern of wire transfers. The diversion and commingling of funds, unknown to FTX's customers, was visible to Silvergate and Lane, as Alameda and its affiliated accounts amassed deposits through incremental small dollar deposits from FTX customers as FTX's business expanded, but those accounts did not experience proportional outflows, as would be expected if Alameda was, in fact, transferring money to an FTX bank account, including one external to Silvergate.

177. Defendants could and did see for themselves that numerous wires earmarked for deposit to FTX for trading on its exchange were ultimately going to Alameda's trading account. Hedge funds

do not generate high volumes of relatively small deposits from a large number of distinct individuals, such as Alameda received through its account at Silvergate, particularly when the firm does not have customers or investors (as Alameda did not). There was no legitimate explanation for any of the transfers, much less transfers of the frequency and size that were apparent to Silvergate and Lane. Similarly, Defendants observed Alameda's failure to segregate customer funds on receipt, and the subsequent inexplicable transfers of these funds once within Alameda's control in a manner inconsistent with its business.

178.    Silvergate and Lane nonetheless accepted deposits of unmistakable incoming investor funds, in miscellaneous amounts, with SBF's own investment firm, which were commingled with Alameda's assets.

179.    The theft of customer funds from FTX accounts occurred in plain sight of Lane and Silvergate. Silvergate, at Lane's direction, provided the bank's services and his own endorsements to FTX and Alameda, notwithstanding FTX and Alameda's high-risk profile as a cryptocurrency business, and despite numerous unmistakable indicators of suspicious activity. This activity included the diversion of FTX funds to Alameda; unexplained related party transactions between and among FTX, Alameda, and the Insiders, which Ray reports were common; the absence of internal controls at FTX and Alameda; Alameda's failure to submit to audits or even generate credible financial statements; repetitive, massive and unexplained transfers of funds from FTX and Alameda-related entities to offshore jurisdictions and vice-versa; FTX's and Alameda's move to offshore, lightly regulated jurisdictions; the lack of business experience of key FTX and Alameda personnel; FTX's and Alameda's failure to staff Chief Financial Officer, Chief Compliance Officer and Chief Risk Control positions; the commingling of funds among unrelated accounts; and a range of other unorthodox business practices and bizarre behavior on the part of the Insiders, including public statements endorsing the use of amphetamines.

180.    Defendants' knowledge of the fraud, breaches of fiduciary duty, and conversion of FTX customer funds by FTX, Alameda, and the Insiders is further underscored by the large volume of business they brought to Silvergate. Silvergate's core business was earning income in the form of

transaction fees and interest on deposits, and FTX and Alameda were two of Silvergate's most important customers. FTX alone accounted for almost 10% of Silvergate's deposits. Consequently, the loss of FTX and Alameda as clients would have been devastating for Silvergate—as demonstrated by Silvergate's collapse only four months after FTX and Alameda's collapse.

### 2.   Defendants Substantially Assisted the FTX Fraud

181.   Defendants not only knew of the fraud perpetrated through the FTX and Alameda accounts at Silvergate, but also they substantially helped FTX, Alameda, and SBF perpetrate that fraud.

182.   Silvergate's interests were tightly entwined with FTX and Alameda. Silvergate's SEN provided the backbone to digital currency exchanges, such as FTX. And Silvergate, in turn, earned revenue from fees charged for those transactions and interests charged on deposits to Silvergate accounts. FTX and Alameda were among the most important customers to Silvergate, as FTX alone comprised approximately 10% of all deposits to Silvergate. Accordingly, as the FTX/Alameda scheme grew, so did Silvergate. In fact, between 2019 and 2021, Silvergate's net income increased nearly tenfold after obtaining FTX as a client.

183.   Silvergate's retention of FTX and Alameda as high-profile clients and its relationship with SBF also benefitted Silvergate. Since 2018, Silvergate has been "all in" on crypto and has held itself out as "the leading provider of innovative financial infrastructure solutions and services to participants in the nascent and expanding digital currency industry." SBF helped to promote Silvergate, stating publicly that "it's hard to overstate how much [Silvergate] revolutionized banking for blockchain companies. Day in and day out, Silvergate$^{TM}$ Exchange Network (SEN) proves it is one of the key backbones of the cryptocurrency settlement layer." And Silvergate prominently advertised this statement by SBF on the front page of its website to build its portfolio of over 1,600 crypto clients.

184.   Silvergate received at least $8 billion in FTX customer assets and maintained at least fifteen FTX- and Alameda-related accounts, including eight accounts for Alameda, two for North Dimension, one for FTX Ventures, and four for FTX Digital Markets. Silvergate oversaw the commingling of funds between these accounts. It processed billions in transfers from FTX's client accounts to the Alameda accounts. And it accepted deposits from FTX investors—intended to be

stored, traded, or cashed out—directly into the bank accounts of Alameda and its shell company, North Dimension. Through its accounts at Silvergate and elsewhere, FTX lent more than half of its $16 billion in customer funds to Alameda, including $4 billion in 2022 alone. According to one analyst report, these transfers were sometimes in the hundreds-of-millions-of-dollar increments and occurred up to several times a day.

185. Lane represented that "Silvergate conducted significant due diligence on FTX and its related entities including Alameda research[.]" But Silvergate continued to complete transfers and set up accounts for Alameda and FTX, despite many red flags indicative of an unlawful scheme, such as unusual redirection of customer funds, unusual patterns of transfers, and the lack of any legitimate explanation for FTX's and Alameda's activities.

186. Not only did Defendants continue to allow FTX and Alameda to use Silvergate accounts, but they also continued to allow FTX to use Silvergate's proprietary SEN network. The SEN network enabled FTX and SBF to continue to on-ramp new customers and allow existing customers to trade cryptocurrency. In other words, Defendants enabled FTX's very existence through the use of Silvergate's SEN network.

187. Allowing FTX to continue to use the SEN also ensured that Silvergate would continue to grow its deposits and generate income from the use of SEN by one of the world's largest cryptocurrency exchanges. As Silvergate has stated in its securities filings: "The SEN has a powerful network effect that makes it more valuable as participants and utilization increase. The SEN has enabled us to significantly grow our noninterest bearing deposit product for digital currency industry participants, which has provided the majority of our funding over the last four years. . . . In addition, use of the SEN has resulted in an increase in noninterest income that we believe will become a valuable source of additional revenue as we develop and deploy fee-based solutions in connection with our digital currency initiative." Silvergate and Lane benefitted financially as a result.

188.    Silvergate's and Lane's identity of interests with SBF, FTX, and Alameda extended to carrying SBF's endorsement on Silvergate's website.  The following endorsement appeared on Silvergate's website:

> "Life as a crypto firm can be divided up into before Silvergate and after Silvergate — it's hard to overstate how much it revolutionized banking for blockchain companies."
>
> — Sam Bankman-Fried
> FOUNDER AND CEO, FTX AND ALAMEDA RESEARCH

**Figure 14**

189.    At times, Silvergate's website carried endorsement an even more emphatic endorsement:

> "Life as a crypto firm can be divided up into before Silvergate and after Silvergate — it's hard to overstate how much it revolutionized banking for blockchain companies. Day in and day out, the Silvergate™ Exchange Network (SEN) proves it is one of the key backbones of the cryptocurrency settlement layer."
>
> — Sam Bankman-Fried
> FOUNDER AND CEO, FTX AND ALAMEDA RESEARCH

**Figure 15**

190.    Defendants' decision to ally with SBF and Alameda to jointly promote the SEN, accept customer deposits, and execute transfers at the direction of FTX and Alameda, and Defendants' other acts and omissions directly in furtherance of the scheme described herein, carried out through Silvergate bank accounts, and other means and facilities, were a substantial cause of the investment losses of Plaintiffs and class members.

1

      **L.**     **The Fallout**

2           191.    On December 12, 2022, SBF was arrested in The Bahamas on the basis of an indictment

3 filed by the U.S. Attorney's Office for the Southern District of New York. The criminal charges against

4 SBF include wire fraud, securities fraud, money laundering, and conspiracy to commit wire fraud and

5 securities fraud.

6           192.    On December 13, 2022, the Securities and Exchange Commission filed a civil action

7 against SBF for securities fraud in the Southern District of New York, alleging in part:

8             •   "[F]rom the start, SBF improperly diverted customer assets to his privately-held crypto

9                  hedge fund . . . and then used those customer funds to make undisclosed venture

10                investments, lavish real estate purchases, and large political donations" and "sank

11                billions of dollars of customer funds into speculative venture investments."

12             •   "SBF diverted FTX customer funds to Alameda in essentially two ways: (1) by directing

13                FTX customers to deposit fiat currency (e.g., U.S. Dollars) into bank accounts controlled

14                by Alameda; and (2) by enabling Alameda to draw down from a virtually limitless 'line

15                of credit' at FTX, which was funded by FTX customer assets."

16             •   "The FTX funds transferred to Alameda were used not only for Alameda's proprietary

17                trading, but also to fund loans to FTX executives, including SBF himself, and to fund

18                personal real estate purchases. Between March 2020 and September 2022, SBF executed

19                promissory notes for loans from Alameda totaling more than $1.338 billion, including

20                two instances in which SBF was both the borrower in his individual capacity and the

21                lender in his capacity as CEO of Alameda."

22             •   "SBF also used commingled funds from Alameda to make large political donations and

23                to purchase tens of millions of dollars in Bahamian real estate for himself, his parents,

24                and other FTX executives."

25             •   "[O]n or about July 22, 2022, SBF loaned himself $136 million."

26           193.    Also on December 13, 2022, the Commodity Futures Trading Commission filed a

27 complaint against SBF, FTX, and Alameda containing similar allegations concerning the scheme.

28

194.    The same day, John J. Ray testified to the House Financial Services Committee that, despite the relatively new cryptocurrency markets involved, FTX committed "really old-fashioned embezzlement. This is just taking money from customers and using it for your own purpose. Not sophisticated at all—sophisticated, perhaps, in the way they were able to sort of hide it from people, frankly, right in front of their eyes."

195.    On December 19, 2022, the U.S. Attorney's Office for the Southern District of New York filed sealed criminal charges against Ellison and Wang.

196.    In December 2022, Ellison and Wang pleaded guilty to criminal charges including conspiracy relating to wire fraud on customers and lenders, securities and commodities fraud, and money laundering.

197.    On December 21, 2022, the SEC and CFTC filed complaints and stipulated judgments against Ellison and Wang. As part of their stipulations with the SEC and CFTC, Ellison and Wang admitted the truth of the SEC's and CFTC's allegations.

198.    On February 28, 2023, Nishad Singh, an FTX co-founder who served as its Director of Engineering, pleaded guilty to the charges in a superseding criminal information filed the same day by the U.S. Attorney's Office for the Southern District of New York.

199.    On the same day, the CFTC and the SEC filed complaints and consent orders against Singh. As part of the consent orders, Singh admitted the truth of the allegations in the complaints.

200.    Collectively, the guilty pleas and consent judgments show that FTX and Alameda employees committed crimes in furtherance of an unlawful scheme to defraud investors, who lost billions of dollars.

201.    Concurrently with FTX's collapse, questions about Silvergate's role in the failed FTX crypto enterprise were raised in Congress and on Wall Street. A letter dated December 5, 2022, signed by Sens. Elizabeth Warren (D-MA) and John Kennedy (R-LA) and by Rep. Roger W. Marshall (R-KS) posed a series of questions to Defendant Alan Lane regarding Silvergate's relationship with the FTX entities, after noting the direct funds transfers from FTX's client account at Silvergate to the accounts of Alameda and other entities under SBF's control. Silvergate's "involvement in the transfer of FTX

1    customer funds to Alameda reveals what appears to be an egregious failure of your bank's

2    responsibility to monitor . . . suspicious financial activity," the letter states.

3         202.   Silvergate CEO Alan Lane responded to the Congressional letter on December 19, 2022.

4    He wrote that "Silvergate is fully committed to complying with its Bank Secrecy Act (BSA) and Anti-

5    Money Laundering (AML) obligations. Mr. Lane claimed that Silvergate "conducted significant due

6    diligence on FTX and its related entities, including Alameda research . . . ."

7         **M.    Agency, Alter Ego, and Co-Conspirator Allegations**

8         203.   At all relevant times, Defendants were each a principal, agent, alter ego, joint venturer,

9    partner, or affiliate of the other Defendants, and in doing the acts alleged herein, were acting within the

10   course and scope of that principal, agent, alter ego, joint venture, partnership, or affiliate relationship.

11   Defendants had actual knowledge of the wrongful acts of the other Defendants; ratified, approved,

12   joined in, acquiesced, or authorized the wrongful acts of the other Defendants; and retained the benefits

13   of those wrongful acts.

14        204.   Defendants aided and abetted, encouraged, and rendered substantial assistance to the

15   other Defendants in perpetrating their fraudulent scheme on Plaintiffs and the class.  In taking action, as

16   alleged herein, to aid, abet, encourage, and substantially assist the commissions of the wrongful acts

17   and other misconduct set forth herein, Defendants acted with an awareness of its primary wrongdoing

18   and realized that its conduct would substantially aid the accomplishment of the wrongful acts and

19   purposes set forth herein.

20        205.   As currently structured, the interests of Silvergate Capital and Silvergate Bank are

21   unified. Silvergate Capital acts as a mere shell to Silvergate Bank. When describing the nature of its

22   business, Silvergate Capital states its "assets consist primarily of its investment in [Silvergate] Bank

23   and its primary activities are conducted through the Bank." Silvergate Capital is the 100% shareholder

24   controlling Silvergate Bank and exercises voting control over a majority of the outstanding stock of

25   Silvergate Bank. Silvergate Capital and Silvergate Bank share the same office or business location, at

26   4250 Executive Square, La Jolla, California. Additionally, Silvergate Capital and Silvergate Bank share

27   employees, counsel, a CEO and President, Alan Lane, and all members of their boards of directors.

28

Silvergate Capital and Silvergate Bank also share a website and logo. And in January 2022, Silvergate Capital purchased certain intellectual property and other technology assets related to running a blockchain-based payment network, to integrate with Silvergate Bank's SEN.  To the extent Silvergate Capital is a separate entity than Silvergate Bank, its form should be disregarded to avoid an inequitable result.  As controlling shareholder of Silvergate Bank, Silvergate Capital directed and knew of the actions taken by Silvergate Bank as alleged herein, while also directing Silvergate Bank to transfer to Silvergate Capital all profits, including tub not limited to the profits stemming from the FTX fraud.

## CLASS ACTION ALLEGATIONS

206.    Plaintiffs sue on their own behalf and on behalf of all other persons similarly situated under Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of a class of all who, between April 1, 2019 and November 11, 2022, sent or deposited fiat currency into an FTX- or Alameda-related account at Silvergate Bank and who, on November 11, 2022, had an account on FTX.com or FTX.US that showed a positive balance (whether in cryptocurrency, fiat currency, or both).

207.    Excluded from the class are Silvergate's employees, affiliates, legal representatives, predecessors, successors, or assigns; any entity in which Silvergate has or had a controlling interest or which has or had a controlling interest in Silvergate; the employees, affiliates, legal representatives, predecessors, successors, or assigns of any of the FTX or Alameda entities; any entity in which an FTX or Alameda entity has or had a controlling interest or which has or had a controlling interest in an FTX or Alameda entity; the immediate family members of Alan Lane; Plaintiffs' counsel; and the judicial officers to whom this litigation is assigned, as well as their staff and immediate family members.

208.    <u>Numerosity</u>. The class members are too numerous to be practicably joined. As of January 2021, there were approximately 1.2 million registered users on the FTX platforms. The class members are identifiable from information and records in the possession, custody, or control of Silvergate. Notice of this action can be readily provided to all members of the class.

209.    <u>Typicality</u>. Plaintiffs' claims are typical of the claims of other members of the class. Plaintiffs and each class member sent or deposited fiat currency into an FTX- or Alameda-related account at Silvergate Bank, had FTX accounts with positive balances when FTX filed for bankruptcy,

have been unable to recover their funds, and were subject to the wrongful conduct alleged in this complaint.

210. <u>Adequacy of Representation</u>. Plaintiffs are members of the class and will fairly and adequately represent and protect their interests. Plaintiffs have no interests contrary to or in conflict with the interests of the other class members.

211. Plaintiffs' counsel are competent and experienced in class action and investment fraud litigation and will pursue this action vigorously.

212. <u>Commonality and Predominance</u>. Common questions of fact and law exist as to all members of the class and predominate over any questions pertaining to individual class members. Among the questions common to the class are:

a. Whether FTX and SBF committed fraud or breached duties to Plaintiffs and members of the class;

b. Whether Silvergate aided and abetted, joined, and/or participated in FTX's or SBF's fraud or breach of duties;

c. Whether Silvergate knowingly carried out transactions in furtherance of the FTX investment scheme despite atypical banking activity and other red flags indicating that SBF, through FTX/Alameda and his other operations, was committing investor fraud, breaching fiduciary duties, and misusing investor funds;

d. Whether Silvergate was unjustly enriched in consequence of its wrongful conduct; and

e. Whether, in view of their investment losses, Plaintiffs and the class are entitled to damages or restitution.

213. <u>Superiority</u>. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Although many class members paid thousands of dollars to deposit or invest assets with FTX, the cost of this litigation will be high. The factual issues are complex and detailed, extend over several years, and relate to many transactions. Absent a class action, most class members would find the cost of litigating their claims individually to be prohibitively high and

would have no effective remedy. Class treatment will conserve resources, avoid inconsistent rulings, and promote efficiency and economy of adjudication in a single court.

**CLAIMS FOR RELIEF**

**COUNT 1**

**Aiding and Abetting Fraud**

**(Against Silvergate and Lane)**

214.    Plaintiffs incorporate all of the foregoing allegations by reference.

215.    SBF, FTX, and Alameda made fraudulent misrepresentations and omissions to the investing public about the nature of the FTX investments and how investor money would be applied. These representations were highly material because no rational investor would have transferred money to FTX knowing that it would be misappropriated by Alameda. Plaintiffs and class members relied to their detriment on these misrepresentations and omissions when depositing or investing assets with FTX.

216.    Defendants knew of and substantially aided this fraud. Silvergate accepted billions of dollars of irregular deposits and approved the related-party transfers, atypical lending, and funds commingling that marked the fraudulent scheme. In connection with providing such material assistance, Defendants were aware of their essential role in the scheme and knowingly acted in furtherance of it. Defendants also substantially benefited from their participation in this scheme.

217.    As a direct and proximate result of Defendants' aiding and abetting of fraud, Plaintiffs and class members have been damaged in an amount to be determined at trial.

**COUNT 2**

**Aiding and Abetting Breach of Fiduciary Duty**

**(Against Silvergate and Lane)**

218.    Plaintiffs incorporate all of the foregoing allegations by reference.

219.    At all relevant times, SBF was the controlling owner and/or CEO of the FTX companies. By reason of SBF's, FTX's, and Alameda's controlling positions, actions, and direct and indirect representations to Plaintiffs and class members, and because Plaintiffs deposited funds into SBF's, FTX's, or Alameda's control with the understanding that they would act in accordance with their

promises in regard to the use of such funds, SBF, FTX, and Alameda owed investors the fiduciary duties of loyalty and care and to deal honestly and in good faith. Nevertheless, SBF, FTX, and Alameda breached fiduciary duties they owed to Plaintiffs and class members by commingling and misappropriating customers' funds. As a direct and proximate result of SBF's, FTX's, and Alameda's fraud, Plaintiffs and other Class Members have been damaged.

220.     Through their knowledge of FTX/Alameda's business model and banking activity, Defendants knew that SBF, FTX, and Alameda owed fiduciary duties to investors, such as Plaintiffs. Defendants substantially assisted these breaches of fiduciary duty by, among other things, executing transfers, accepting deposits, and allowing continued use of the SEN even while knowing those duties were being breached. The breaches of duty were enabled by and would not have been possible but for Defendants' relevant actions and inaction.

221.     As a direct and proximate result of Defendants' aiding and abetting of breach of fiduciary duty, Plaintiffs and class members have been damaged in an amount to be determined at trial.

## COUNT 3

### Unjust Enrichment

### (Against Silvergate)

222.     Plaintiffs incorporate all of the foregoing allegations by reference.

223.     Plaintiffs lack an adequate remedy at law.

224.     Plaintiffs and the other class members conferred benefits on Silvergate by depositing funds into and using the FTX exchange platforms.

225.     Silvergate acquired ill-gotten gain, including in the form of revenues, derived from Plaintiffs' and the other class members' funding and use of the FTX exchange platforms.

226.     Silvergate condoned and furthered the wrongful conduct from which it benefited. Its retention of these sums is therefore inequitable.

227.     Silvergate's wrongful gain should be restored to Plaintiffs and the class.

**COUNT 4**

**Aiding and Abetting Conversion**

**(Against Silvergate and Lane)**

228.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

229.    As set forth herein, by misappropriating the funds that Plaintiffs and class members deposited, or intended to deposit with FTX, the Insiders unlawfully converted the funds.

230.    Silvergate and Lane knowingly and substantially provided materially assistance to the Insiders in the commission of the conversion in the following respects:

- Accepting for deposit funds that were designated for investment in FTX and executing transfers to deposit them instead into accounts controlled by Alameda;

- Failing to title and identify the North Dimension and Alameda accounts as holding customer funds in segregation pursuant to the Commodity Exchange Act ("CEA");

- Failing to identify, monitor, or exercise any due diligence related to discrepancies and inconsistencies concerning deposits of Plaintiffs' and other proposed class members' funds intended for FTX;

- Failing to implement and adhere to the purported compliance and monitoring protocols Silvergate claimed to observe concerning the Insiders' use of plaintiffs' and other proposed class members' funds;

- Failing to identify, monitor, or exercise any due diligence related to the regulatory and compliance "red flags" identified herein;

- Failing to identify, monitor, or exercise any due diligence related to Alameda not treating funds in its accounts as CEA customer segregated funds account;

- Failing to prevent or otherwise take action with respect to FTX and the Insiders using customer funds in the fiat@ftx.com account and other FTX accounts for the operational expenses of Alameda;

- Failing to prevent or otherwise take action with respect to FTX and the Insiders using customer funds in the fiat@ftx.com account and other FTX accounts for non-FTX entities;

- Failing to notify Plaintiffs, other members of the proposed class, FTX management, FTX's auditor, or any governmental entity or regulator about FTX's and the Insiders' misappropriation of funds designated for customer segregated accounts; and

- Causing and allowing customer assets to be misappropriated for the use of FTX, its affiliates, the Insiders, and other non-FTX customers.

231.    By virtue of its substantial and material assistance to the Insiders, Silvergate was aware of its role in the Insiders' conversion and it acted knowingly in assisting the Insiders.

232.    As a direct and proximate consequence of Silvergate's conduct as described in the foregoing and throughout this complaint, plaintiffs and other members of the proposed class have lost a significant portion of the money, securities, and property they paid and delivered to FTX, have been denied the use of their assets since no later than November 11, 2022, and have been damaged thereby at an amount to be determined at trial.

### COUNT 5

**Violations of the Unfair Competition Law**

**Cal. Bus. & Prof. Code § 17200 *et seq.* (UCL)**

**(Against Silvergate and Lane)**

233.    Plaintiffs incorporate the foregoing allegations by reference.

234.    The UCL forbids any unlawful, unfair, or fraudulent business act or practice.

235.    Silvergate's conduct was unlawful because Silvergate violated applicable Bank Secrecy Act and anti-money laundering regulations, particularly relating to KYC and AML duties, including those requiring implementation of a program to ensure adequate due diligence of banking customers and their account activity, and also constituted fraud, fraudulent concealment, civil conspiracy, negligence, and unjust enrichment..

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:23-cv-00667-JSC

236.    Lane's conduct was unlawful because it violated applicable Bank Secrecy Act and anti-money laundering regulations, particularly relating to Silvergate's KYC and AML duties, and constituted fraud, fraudulent concealment, civil conspiracy, negligence, and unjust enrichment.

237.    Plaintiffs and the Class reserve the right to allege other violations of law which constitute other unlawful business acts or practices by Silvergate and Lane.

238.    Silvergate's conduct was unfair in violation of the UCL by reason of its unscrupulous, oppressive, and substantially injurious actions and inaction.  Among other unfair conduct, Silvergate:

a.    Acted in furtherance of the FTX fraud, including by executing thousands of transfers between related accounts and by commingling customers funds;

b.    Knowingly facilitated the Insiders' misappropriation and misuse of customer funds;

c.    Continued to aid FTX in defrauding customers, and failing to take corrective action, in response to the panoply of other irregular banking activities detailed above, many of which should have triggered electronic alerts; and

d.    Failed to implement and adhere to mandatory Bank Secrecy Act and anti-money laundering protocols.

239.    Lane's conduct was unfair in violation of the UCL by reason of its unscrupulous, oppressive, and substantially injurious actions and inactions. Among other unfair conduct, Lane:

a.    Acted in furtherance of the FTX fraud, including by publicly promoting SBF and other FTX Insiders;

b.    Knowingly facilitated the Insiders' misappropriation and misuse of customer funds, including by assisting Silvergate in that regard;

c.    Failed to advise Plaintiffs and other Class Members of the FTX fraud and misappropriation of their funds, or to otherwise disclose material information to Class Members who were sending funds to Silvergate; and

d.    Failed to implement and adhere to mandatory Bank Secrecy Act and anti-money laundering protocols, or ensure that Silvergate did so.

240.     The gravity of the harm resulting from Silvergate's unfair conduct outweighs any potential utility of the conduct.  Silvergate's failure to take appropriate and necessary steps to protect customers harms the public at large and forms part of a common and uniform course of wrongful conduct.  There are reasonably available alternatives that would have furthered Silvergate's business interests, such as immediately reporting the suspicious account transactions and other atypical activities associated with FTX's and its affiliate companies' Silvergate accounts.

241.     The harm from Silvergate's unfair conduct was not reasonably avoidable by customers.

242.     Plaintiffs and the class suffered injury in fact, and lost money or property, as a direct and proximate result of Silvergate's unlawful and unfair conduct.  Plaintiffs accordingly seek restitution as provided for under Cal. Bus. & Prof. Code § 17203, in addition to reasonable attorneys' fees and costs.

## COUNT 6

### Negligence

### (Against Silvergate and Lane)

243.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

244.     At all relevant times, the Insiders and the FTX- and Alameda-related entities caused funds belonging to Plaintiffs to be deposited into accounts at Silvergate.

245.     Silvergate and Lane owed a duty to Plaintiffs and other members of the class with respect to the maintenance and use of the accounts and the funds held therein, by reason of all the facts and circumstances alleged herein, including for the following:

a.     Plaintiffs entrusted Silvergate and FTX with their money;

b.     Silvergate and Lane were aware that FTX had a fiduciary relationship with Plaintiffs;

c.     Silvergate knew the Insiders, FTX, and Alameda were misleading Plaintiffs by representing that the FTX- and Alameda-related entities were run separately and appropriately;

d.     Silvergate and Lane knew the deposits were intended to be held in trust, and that the funds were being misappropriated by Alameda and the Insiders. Silvergate and Lane knew that the funds deposited into the accounts were not being segregated and applied in a manner consistent with

any of FTX's representations and the norms and requirements applicable to such accounts. Silvergate and Lane had superior and exclusive knowledge of the misconduct, including of FTX's violation of its own Terms of Service;

e.     Silvergate and Lane facilitated the Insiders' misappropriation and misuse of customer funds by processing transactions and accepting deposits for the FTX- and Alameda-related accounts;

f.     Silvergate and Lane benefitted financially from the deposits and transaction fees resulting from its ongoing service to the FTX- and Alameda-related accounts;

g.     Silvergate and Lane benefitted financially from SBF's public statements endorsing Silvergate and its services; and

h.     Silvergate and Lane reasonably understood that the public relied on Silvergate, as a bank specializing in the relevant subject matter, to refrain from providing services to customers who were engaging in ongoing diversions of funds.

246.     Despite having these duties, Silvergate and Lane negligently, carelessly, recklessly, and/or unlawfully mishandled, deposited, transferred, and commingled Plaintiffs' assets, and failed to notify Plaintiffs of the ongoing diversion of funds and other misconduct by FTX. Silvergate and Lane breached their duty to Plaintiffs when, among other things, they:

a.     Did not disclose to Plaintiffs the misconduct and misrepresentations by the Insiders, FTX, Alameda, or related entities;

b.     Facilitated transactions and accepted deposits, including deposits from FTX investors into Alameda accounts; and

c.     Designed and operated the SEN, which lacked the control procedures required under BSA regulations, *see* 31 C.F.R. § 1010.100(ff).

247.     Silvergate and Lane's breaches of duty as described throughout this complaint are direct and proximate causes of damages to Plaintiffs and the members of the class in an amount to be determined at trial, including punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for a judgment:

A.      Certifying this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), appointing Plaintiffs as class representatives and their attorneys as class counsel under Federal Rule of Civil Procedure 23(g), and requiring Defendants to pay the costs of notice to the class;

B.      Awarding damages or restitution, including pre-judgment interest, upon each Count in an amount to be determined at trial;

C.      Awarding reasonable attorneys' fees and costs of litigation; and

D.      Granting such other relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs seek a jury trial of any Counts for which a trial by jury is permitted by law.

Respectfully submitted,

Dated: May 19, 2023

By:  _/s/ *Daniel C. Girard*
Daniel C. Girard
Adam E. Polk
Tom Watts
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800
dgirard@girardsharp.com
apolk@girardsharp.com
tomw@girardsharp.com

By:  _/s/ *Jack Fitzgerald*
Jack Fitzgerald
Paul K. Joseph
Melanie Persinger
Trevor M. Flynn
Caroline S. Emhardt
**FITZGERALD JOSEPH LLP**
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
jack@fitzgeraldjoseph.com
paul@fitzgeraldjoseph.com
melanie@fitzgeraldjoseph.com
trevor@fitzgeraldjoseph.com
caroline@fitzgeraldjoseph.com

60

Timothy G. Blood
Thomas J. O'Reardon
James M. Davis
**BLOOD HURST & O'REARDON, LLP**
501 West Broadway, Suite 1490
San Diego, CA 92101
Phone: (619) 338-1100
tblood@bholaw.com
toreardon@bholaw.com
jdavis@bholaw.com

By: */s/ Michael J. Reiser*
Michael J. Reiser
Matthew Reiser
Isabella Martinez
**REISER LAW, p.c.**
1475 N. Broadway, Suite 300
Walnut Creek, California 94596
Telephone: (925) 256-0400
michael@reiserlaw.com
matthew@reiserlaw.com
isabella@reiserlaw.com

Jason Kellogg, Esq.
Victoria J. Wilson, Esq.
Marcelo Diaz-Cortes, Esq.
**LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP**
100 Southeast Second Avenue
36th Floor
Miami, Florida 33131
Telephone: (305) 403-8788
jk@lklsg.com
vjw@lklsg.com
jk@lklsg.com

Jason S. Hartley
Jason M. Lindner
**HARTLEY LLP**
101 West Broadway, Suite 820
San Diego, CA 92101
(619) 400-5822
hartley@hartleyllp.com
lindner@hartleyllp.com

*Attorneys for Plaintiffs*

61

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:23-cv-00667-JSC